Argued and submitted December 20, 1999, affirmed May 3, 2000

STATE OF OREGON,
*Appellant,*

*v.*

DAVID L. COLEMAN,
*Respondent.*

(97-4693A-FE; CA A102399 (Control))

STATE OF OREGON,
*Appellant,*

*v.*

DAVID COLEMAN
and Debra D. Blair,
*Respondents.*

(97-4823A-FE; CA A102400)

STATE OF OREGON,
*Appellant,*

*v.*

DEBRA DIANE BLAIR,
*Respondent.*

(98-2081-MI; CA A102401)
(Cases Consolidated)

2 P3d 399

Timothy A. Sylwester, Assistant Attorney General, argued the cause for appellant. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Robert J. McCrea argued the cause and filed the brief for respondents.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

LINDER, J.

## LINDER, J.

The state appeals from a pretrial order suppressing evidence obtained in a warrantless search of an automobile, arguing that the search fell under the "automobile exception" to the warrant requirement. We conclude that the automobile exception does not apply and that the warrantless search therefore violated Article I, section 9, of the Oregon Constitution. Accordingly, we affirm.

On October 9, 1997, police executed a warrant authorizing a search of a Medford residence for evidence relating to the manufacture and distribution of methamphetamine. In the course of executing that warrant, Detective Holthus encountered defendant Coleman, who was walking out of a motor home parked in the backyard of the residence, about 15 to 20 feet away from the residence. Holthus explained to Coleman that he was executing a search warrant, asked him to stop, and patted him down. In the patdown, Holthus found, among other things, a set of keys. Although Coleman was not named in the search warrant, Holthus handcuffed Coleman and led him to the living room of the residence.

Sometime after the initial encounter with Coleman, several of the officers discussed whether they should search Coleman's car, which was parked near the motor home but was not identified in the search warrant. Detective Leach, the officer in charge of executing the search warrant, ultimately searched the car and did so without first obtaining a warrant. He found containers of sulphuric acid and cupric sulphate, as well as receipts for purchases of other materials commonly used in the manufacture of methamphetamine. Based in part on finding those items, Leach applied for and obtained a warrant to search Coleman's residence in Ashland, Oregon. The search of the Ashland residence revealed additional evidence relating to the manufacture and distribution of methamphetamine.

Coleman and defendant Blair, who also lived at the Ashland residence,[1] were charged jointly with manufacture,

---

[1] In her motion to suppress, Blair argues that the search of "her home" was illegal. The evidence presented at the hearing does not disclose any information

delivery, and possession of a controlled substance. *See* ORS 475.992. Coleman filed a motion to suppress the evidence obtained in the search of the automobile and argued that the evidence derived from the automobile search should be stricken from the affidavit in support of the residential search warrant as "fruit of the poisonous tree." Coleman also asserted that the affidavit in support of the warrant would be insufficient if that evidence were stricken. Blair moved to suppress the evidence obtained in the residential search on several grounds, most of which related to the sufficiency of the affidavit. The trial court granted both motions, determining that the search of the automobile violated "Oregon law" and that the affidavit in support of the search warrant was inadequate for several reasons, including its insufficiency without the information derived from the search of Coleman's car. The state appeals both rulings as to both defendants, arguing first that the trial court incorrectly concluded that the automobile exception did not apply to the search of Coleman's car.[2] Relatedly, the state also assigns error to the trial court's suppression of evidence obtained in the subsequent search of the Ashland residence. The state agrees that we need to reach that issue only if we determine that the search of the automobile was lawful. Our analysis therefore begins with a discussion of the "automobile exception" to the warrant requirement of Article I, section 9,[3] and an analysis of its application here.

---

regarding defendant Blair's relationship to the residence or the evidence obtained in the search. We assume for purposes of this opinion that Blair lived at the Ashland residence.

   [2] After the trial court issued its suppression orders, the state filed an information charging Blair with several counts of frequenting a place where controlled substances are used, ORS 167.222, in addition to the charges for manufacture, possession, and delivery of controlled substances. Because the charges were added by way of information, rather than by amending the grand jury indictment, the subsequent charges initiated a second "case" against Blair. The trial court consolidated the "cases" and ordered its earlier pretrial suppression order also to apply to the later-filed information. Our decision on appeal therefore extends to the second case against Blair.

   [3] That section provides:

   "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

Exceptions to the warrant requirement have long been recognized in situations where "exigent circumstances" make it impracticable to obtain a warrant. *State v. Quinn*, 290 Or 383, 390-91, 623 P2d 630 (1981). Oregon courts consistently have recognized the application of the exigent circumstances doctrine in the context of automobile searches. As the court in *Quinn* noted:

> "[A]n automobile, which is mobile by its very nature, may be searched and seized without a warrant if there is probable cause to believe that it contains fruit, instrumentalities or evidence of crime and if there are also exigent circumstances which make it impracticable to obtain a warrant."

*Id.* at 391. Thus, under *Quinn*, the state had to demonstrate both probable cause and exigent circumstances in order to overcome the presumption that a warrant is required. That changed when the Supreme Court later expanded the exigency doctrine to provide that a *per se* exigency rule will apply in circumstances where the officers have probable cause to believe that an automobile contains contraband or evidence of a crime and was mobile when lawfully stopped by police. *State v. Brown*, 301 Or 268, 277, 721 P2d 1357 (1986). That *per se* rule has come to be known as the "automobile exception."

■■ The court in *Brown* left open the possibility that the automobile exception might be expanded to cover situations in which the automobile "has not just been lawfully stopped by a police officer." *Id.* The Supreme Court later confronted and rejected such an expansion in *State v. Kock*, 302 Or 29, 725 P2d 1285 (1986). In that case, officers searched an automobile that was parked in a parking lot while the defendant was inside the store where he worked. The court concluded that the automobile exception should not apply and, instead, declared that *Brown* marked the "outer limit for warrantless automobile searches without other exigent circumstances." *Kock*, 302 Or at 33. The court noted:

> "Although logically it can be argued that the rationale of the seminal case of *Carroll v. United States*, 267 US 132, 45 S Ct 280, 69 L Ed 543 (1925), and its progeny * * * would justify extending the automobile exception to automobiles that are *capable of mobility*, we elect to draw the so-called

bright line of *Brown* just where we left it in that case: Searches of *automobiles that have just been lawfully stopped by police* may be searched without a warrant and without a demonstration of exigent circumstances when police have probable cause to believe that the automobile contains contraband or crime evidence."

*Id.* at 32-33 (emphasis added). The court held:

"[A]ny search of an automobile that was parked, immobile and unoccupied at the time the police first encountered it in connection with the investigation of a crime must be authorized by a warrant issued by a magistrate or, alternatively, the prosecution must demonstrate that exigent circumstances *other than the potential mobility* of the automobile exist."

*Id.* at 33 (emphasis added). Thus, in a lawful traffic stop, the state need not articulate particular circumstances demonstrating the impracticality of obtaining a warrant. Rather, exigency is presumed. If, however, the automobile exception does not apply, then the state must be able to justify a warrantless search by demonstrating that the particular circumstances of the encounter, *other than the potential mobility of the automobile*, demonstrate the impacticality of obtaining a warrant.

In the years following *Brown* and *Kock*, this court further refined the automobile exception analysis in *State v. Cromwell*, 109 Or App 654, 820 P2d 888 (1991), *State v. Warner*, 117 Or App 420, 844 P2d 272 (1992), and *State v. Burr*, 136 Or App 140, 901 P2d 873, *rev den* 322 Or 360 (1995). In *Cromwell*, officers encountered the defendant's truck parked in the middle of the roadway. Its engine was not running, and its parking lights were on. The defendant and a companion were sitting inside the truck. The officers approached, and one of them asked the defendant what was underneath a jacket that was located on the seat. The defendant revealed he had marijuana under the jacket and in his shirt pocket. The officers then searched the truck and discovered methamphetamine in the defendant's jacket pocket. *Cromwell*, 109 Or App at 656. In examining whether the automobile exception permitted the warrantless search of the truck, we stated:

"The truck was not actually in motion when police encountered it, but to say that it was 'immobile' draws too fine a distinction. The truck was 'mobile' in that defendant could have driven away at any moment. The fact that defendant had not yet turned the key was merely fortuitous. * * * The search of defendant's truck was lawful, and the trial court correctly denied his motion to suppress."

*Id.* at 659 (citation omitted).

In *Warner*, the arresting officer first saw the defendant's pickup traveling in the opposite direction at a very slow speed. After the defendant's vehicle passed by, the officer saw it move onto the shoulder and stop. The defendant got out and opened the hood. The officer turned around and parked behind the pickup, without turning on his overhead lights. The defendant lowered the hood. The officer asked the defendant if he needed help, but the defendant did not respond. Instead, he got in the pickup and attempted to start it. The engine sputtered and then died. The officer detected the odor of methamphetamine emitting from the vehicle, searched it, and discovered controlled substances. *Warner*, 117 Or App at 422. We concluded, based in part on our analysis in *Cromwell*, that an automobile is considered to be "mobile" if it is "occupied and operable when the police first encounter it." *Id.* at 423. Distinguishing the facts in *Cromwell*, we noted that, because "the pickup was crippled" when the officer first observed it and "broke down shortly thereafter," the evidence did not support the trial court's finding that the pickup was mobile. *Id.* at 424. In other words, we concluded that the automobile exception did not apply because the pickup was not operable when the police first encountered it.

■ In *Burr*, an officer encountered a pickup parked on the shoulder of a road with its lights off. The officer pulled up and got out of his vehicle to see if the defendants were in need of assistance. The four defendants were standing outside of the vehicle and were in the process of loading a deflated rubber raft into the bed of the pickup. The officer asked the defendants for identification, ran an identification check, discovered that one of the defendants was wanted on a felony warrant, and placed that defendant under arrest. Meanwhile, another officer arrived at the scene, immediately

smelled marijuana, and observed that the smell was strongest near the rear of the pickup. He moved the raft and uncovered two ice chests full of freshly cut marijuana. *Burr*, 136 Or App at 143-44. In analyzing the applicability of the automobile exception, we noted first that the trial court had concluded that the vehicle was parked and unoccupied at the time of the encounter. *Id.* at 145, 148. We determined, however, that the trial court erred in concluding that the vehicle was not "mobile." In light of our interpretation of the meaning of the word "mobile" in *Cromwell* and *Warner*, we held that:

> "[t]he fact that defendants were not in the cab of the vehicle is a mere fortuity. They need only have taken a few steps to have placed themselves in the vehicle in order to leave. In the light of the rationale for the rule, it would be a curious result to hold that the pickup was not mobile because defendants were standing outside the cab instead of sitting inside it when either circumstance would permit the driver to immediately drive off. In that sense, the pickup was 'occupied and operable' when the police first encountered it."

*Burr,* 136 Or App at 149 (citation omitted). In so holding, we distinguished *Kock*, noting that the defendant in that case had "left the locale of the automobile," while in *Burr* and *Cromwell*, the vehicle in each case was "mobile" because someone was "in the position to operate it and leave in it immediately when the police first encountered it." *Burr,* 136 Or App at 149. In other words, *Burr* stands for the proposition that the automobile exception also applies to a vehicle that is operable and constructively occupied—that is, someone is in a position to operate it and leave in it immediately—at the time the police first encounter it.

One theme that emerges from the foregoing cases is that applicability of the automobile exception turns on the mobility of the vehicle *when the police first encounter it.* The inquiry is centered on the circumstances surrounding the moment when the police first notice or focus their attention on an automobile. In a routine traffic stop, that moment is obvious: The police become aware of the automobile at or near the time that they discover a lawful reason for stopping it. The police in *Burr* and *Cromwell*, on the other hand, were

not involved in what could be described as a routine traffic stop. Rather, in each of those cases, the officers pulled up next to or behind automobiles that were parked in the middle or on the side of a road. Nonetheless, as in a routine traffic stop, the police had focused their attention on the vehicle at the same time they encountered the defendants and under circumstances where the vehicle was attended and, to one extent or another, in use.

██ We turn, then, to the circumstances surrounding the initial encounter with Coleman's car. Although the trial court did not make any factual findings in granting defendants' motions to suppress, we presume on review that it decided the facts in a manner consistent with its ultimate conclusion that the search violated "Oregon law." *See State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993) (discussing standard of review where trial court does not make findings of historical fact). The state argues that the automobile exception applies because Coleman was only a few feet away from his car and had keys in his pocket at the time Holthus approached him. According to the state, Coleman was therefore in a position to operate it and leave in it immediately. The problem with the state's position is that there is no direct evidence in the record to support the state's assumption that the police had focused their attention on Coleman's car, or knew it to be Coleman's car, at the time they initially stopped and detained him.

Here, Holthus testified that he initially encountered Coleman as he was walking out of a motor home and toward the Medford residence. At the time, the police were executing a search warrant on the residence, and neither Coleman nor his car was identified in that search warrant. At the suppression hearing, the state specifically asked Holthus about his awareness of Coleman's car:

"Q. Detective Holthus, * * * did you ever have personal knowledge that a 1991 Nissan Stanza, Oregon license number SKP 573, was parked next to the residence at King Street?

"A. I do not recall the license plate. I just know that there was, as described, [a] Nissan Stanza. I saw the vehicle parked there. I had nothing to do with * * * the vehicle on that day."

Holthus continued to describe that, at the time Coleman was stopped and detained, Coleman was standing about 15 feet away from the car. Holthus did not, however, specifically describe when he focused his attention on the car or when he determined that it belonged to Coleman. Nor did any of the other officers provide a more detailed description of the events leading up to the search of Coleman's car. Sergeant Barthel, the supervisor who authorized the search, testified that he knew the car belonged to Coleman because Leach told him. Leach, who ultimately conducted the search of Coleman's car, did not identify when he first became aware of the car or knew that it belonged to Coleman. He described only that he found Coleman's keys on the table inside the residence (presumably where Holthus had left them) and had discussed the legality of a warrantless search with several officers.[4]

Thus, the precise moment at which the police focused their attention on the car is unclear, and the evidence on that particular issue is, to say the least, scant. To accept the state's position, we would have to infer two things from the evidence: (1) that the car was, at least in part, a focus of the initial encounter with Coleman; and (2) that Holthus was aware that Coleman was in a position to operate and leave in the car at the time of the initial encounter. On this record and in this procedural posture, the state is not entitled to those inferences. The trial court reasonably could have inferred from the facts that the officers did not focus their attention on Coleman's car until after they handcuffed him and took him inside the house and, further, that they did not have a reason to search the car until several hours after Coleman had been stopped and detained. Presuming those facts, the police did not encounter the car until Coleman had, as in *Kock*, "left the locale of the automobile" and was not in a position to operate the car or to leave in it immediately. *See Burr*, 136 Or App at 149 (discussing *Kock*). Accordingly, the trial court did not err in granting defendants' motions to suppress.

---

[1] Leach believed that federal law likely would permit a search of Coleman's car but was concerned that a warrant may be required under state law because the car might not be considered "mobile."

Because we conclude that the search of the automobile violated Article I, section 9, we need not reach the state's second assignment of error.

Affirmed.