Argued and submitted January 21, reversed and remanded September 29, 2010, petition for review allowed February 17, 2011 (349 Or 654)

STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

TYLER JURO KUROKAWA-LASCIAK,
*Defendant-Respondent.*

Douglas County Circuit Court
07CR1309FE; A140430

239 P3d 1046

Jeremy C. Rice, Assistant Attorney General, argued the cause for appellant. With him on the brief were John R. Kroger, Attorney General, and Erika L. Hadlock, Acting Solicitor General.

Jay W. Frank argued the cause for respondent. With him on the brief was Moule & Frank.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

SCHUMAN, J.

## SCHUMAN, J.

The state appeals an order suppressing evidence found during a warrantless search of defendant's van. It argues that the search was lawful under the automobile exception to the warrant requirement or, in the alternative, because the search occurred after the voluntary consent of a person with authority over the vehicle. We agree with the state that, under the automobile exception as it has evolved up to the present, the warrantless search was lawful. We therefore reverse and remand.

We take the following facts from the trial court's findings, which are undisputed and supported by constitutionally sufficient evidence in the record. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). An employee at Seven Feathers Casino had observed defendant on several occasions buying chips with large quantities of $20 bills and, after a brief interval, cashing in the chips for large denomination bills. In such circumstances, in order to facilitate compliance with its understanding of federal money laundering laws, the casino has a policy of asking for identification in order to track the player's transactions. A player who does not provide identification is prohibited from making any additional transactions for 24 hours. In accordance with that policy, casino officials asked defendant for his identification and, when he refused, the officials told him he was barred from making further transactions. To ensure that he could not do so, the casino distributed to all its cashiers a photograph of defendant made from surveillance videos. When defendant later saw his photo in a cashier's cage, he reached into the cage, grabbed the photo, and walked away. At that point, he was asked to leave the premises, and a casino employee alerted Bennett, a senior state trooper assigned to the casino as a tribal gaming detective.

Defendant went to the parking lot, got in his rental van, and drove away—apparently to buy gas before returning to pick up his girlfriend, Campbell, and their small children. When he returned to the parking lot, he parked his van, turned off the engine, and walked back toward the casino. He was about 30 feet from his car when Deputy Wohls stopped him. Wohls detained defendant until Bennett appeared on

the scene to begin the investigation into the money laundering suspicions.

Bennett arrived, identified himself, informed defendant that he would be recording the conversation, and administered *Miranda* warnings. He then told defendant that he believed further evidence of criminal activity was in defendant's van and asked for consent to search it. Defendant refused and asked to speak with an attorney. Bennett placed defendant under arrest for theft and disorderly conduct and transported him to the local jail. At some point during this encounter, defendant gave his girlfriend Campbell the keys to the van and told her to check on the dog, which was in the van, and then to "lock it up, and don't go anywhere, just wait for me." Campbell did as she was told and then went into the casino restaurant.

Bennett approached Campbell while she was eating breakfast there. He told her that defendant had been taken into custody and asked her twice if there was money or drugs in the van. She replied that she was not aware of any. He then asked her for identification, which she provided; after he looked at it, he asked if there was any marijuana in the van. This time, she responded that there was "a little bit." Bennett asked if it was under or over an ounce. She said, "It is probably under, but it could be over a little bit." He then asked her if she would consent to a search of the van, and she told him that, because she was not on the rental agreement, she was not sure that she had authority to consent. She also told him that she had the keys to the van and intended to drive it away. Bennett told her that if she did not consent to a search of the van, he would impound it and get a search warrant. He then told her that she could finish her breakfast and he would meet her by the van in the parking lot.

There, he repeated his request for consent. She was hesitant and told Bennett that she was feeling badgered. He replied that he was not badgering her. After more back and forth between Campbell and Bennett, which included Campbell making a telephone call, she eventually signed a consent form. Bennett then searched the van and found the evidence in dispute: 77 grams of marijuana, 56 grams of

hashish, electronic gram scales, and approximately $48,000 in cash.

Before trial, defendant filed a motion to suppress the evidence found in the van. Defendant argued that Campbell's consent to search the van was involuntary and that the automobile exception to the warrant requirement did not apply to the van.[1] The trial court concluded that there was probable cause to arrest defendant, but that Campbell's consent was involuntary and that the automobile exception did not apply.

As to the automobile exception, the trial court reasoned as follows:

"Before [Bennett] arrived, defendant had already handed the vehicle's keys to Ms. Campbell and told her to go to the restaurant to eat breakfast and to take care of the dog in the car. In other words, the car was immobile because [defendant] was no longer near the vehicle and did not possess the keys before [Bennett] arrived at the parking lot and developed probable cause. The vehicle was not the focus of the stop of [defendant] at the time of the encounter by [Wohls].

"* * * * *

"A vehicle is 'mobile' if it is actually moving when first encountered and is actually or constructively occupied. * * * When defendant was approached by [Wohls], the vehicle [did] not qualify as 'mobile.' [Defendant] was stopped outside his vehicle which was about thirty feet away. The focus of the stop was not the vehicle but [defendant]. * * * Since the focus of the stop was the person and not the person in the automobile, the automobile 'mobility' exception does not apply. At the time of defendant's stop by [Wohls], there was no probable cause to search the automobile and there was no focus on the automobile. It simply wasn't a concern until [Bennett] * * * developed probable cause."

The state's appeal followed. ORS 138.060(1)(c) (authorizing state's appeal of order granting motion to suppress).

---

[1] Defendant also argued that Bennett did not have probable cause to arrest him and that statements he made after invoking his *Miranda* rights were inadmissible. We reject the probable cause argument without discussion. The trial court agreed with defendant's *Miranda* argument and that ruling is not challenged on appeal.

■ We begin with the state's argument that the search was lawful because it fell within the "automobile exception" to the warrant requirement of Article I, section 9, of the Oregon Constitution. That judge-made doctrine has what charitably might be called an irregular history. We have exhaustively recounted that history in earlier cases—notably *State v. Coleman*, 167 Or App 86, 91-95, 2 P3d 399 (2000), and *State v. Snow*, 179 Or App 222, 226-32, 39 P3d 909 (2002), *aff'd*, 337 Or 219, 94 P3d 872 (2004)—and it would serve no purpose to do so again. Briefly, the exception was created in *State v. Brown*, 301 Or 268, 274, 721 P2d 1357 (1986), where the Supreme Court held that no warrant was necessary to search a vehicle, "provided (1) that the automobile is mobile at the time it is stopped by police * * * and (2) that probable cause exists for the search of the vehicle." Notably, in that case, the court did not hold that the automobile exception applied when police came upon an unmoving vehicle, and, in fact, that suggestion was disavowed in *State v. Kock*, 302 Or 29, 32-33, 725 P2d 1285 (1986), where the court in no uncertain terms rejected the theory that the exception extended to "stationary but operational vehicle[s]." Further, in *Brown*, the court held that, when officers had probable cause to search the automobile for evidence of a theft, they could search the vehicle for evidence of *that crime*. 301 Or at 270. The case did not deal with the situation in which police approach a parked vehicle without any suspicion of criminal activity and, during the subsequent conversation, develop probable cause and then conduct a warrantless search. Nor did it deal with the situation in which police have probable cause to stop a vehicle for one offense (for example, a traffic violation) and then conduct a search of the vehicle for evidence of a crime for which they develop probable cause only during the stop (for example, possession of contraband).

■ In the years since *Brown* and *Kock*, however, the courts have "refined the automobile exception analysis," *Coleman*, 167 Or App at 92, although "refined" is not universally accepted as the proper verb. *See State v. Burr*, 136 Or App 140, 150, 901 P2d 873, *rev den*, 322 Or 360 (1995) (Armstrong, J., dissenting) (court has expanded *Brown* and ignored *Kock*). At present, a vehicle is "mobile" for purposes

of the automobile exception as long as it is operable. *State v. Meharry*, 342 Or 173, 181, 149 P3d 1155 (2006) (vehicle remains mobile even when blocked by a police car and driver is under arrest because the vehicle "could have been moved once [the police officer] relinquished control over it"); *Snow*, 179 Or App at 232 (describing such cases as involving "constructive mobility"); *State v. Cromwell*, 109 Or App 654, 820 P2d 888 (1991). That is so even if it is evident that the vehicle will be impounded, unless the impoundment procedures have actually commenced. *State v. Getzelman*, 178 Or App 591, 601, 39 P3d 195, *rev den*, 334 Or 289 (2002). Further, police can search a vehicle pursuant to the automobile exception even if, at the time the officers first focus on the vehicle, they have no suspicion of criminal activity. *Coleman*, 167 Or App at 95-96; *Burr*, 136 Or App at 143; *Cromwell*, 109 Or App at 656. Situations in which the exception does *not* apply include those in which the vehicle is functionally disabled, *State v. Warner*, 117 Or App 420, 844 P2d 272 (1992); those in which the vehicle is impounded or in the process of being impounded, *State v. Kruchek*, 156 Or App 617, 969 P2d 386 (1998), *aff'd by an equally divided court*, 331 Or 664, 20 P3d 180 (2001); and those in which the officers do not focus attention on the vehicle until after they have established probable cause to detain the defendant, *Coleman*, 167 Or App at 96.

As defined by these cases, the automobile exception encompasses the warrantless search of defendant's van. Bennett focused his attention on the van almost immediately after he arrived on the scene, when he asked for (and was denied) consent to search it. The trial court ruled, and we agree, that he did not have probable cause to search it at that point; he developed probable cause to search the van only after Campbell admitted that it contained marijuana in an amount that "could be" more than an ounce. Defendant argues that, because Campbell admitted only that there "could be" more than an ounce, the officers lacked probable cause to believe the van contained evidence of a *crime*. Even if we were to agree that "could be" does not equate to "probably is," our determination would be the same; in *State v. Smalley*, 233 Or App 263, 225 P3d 844, *rev den*, 348 Or 415

(2010), we held that probable cause to believe a mobile vehicle contained less than an ounce of marijuana justifies a warrantless automobile search because even that noncriminal amount is "contraband."

At the time that this probable cause developed, the vehicle was "mobile" under our cases and under *Meharry*, 342 Or at 180-81, in which, as noted above, the Supreme Court held that even an automobile that was blocked by a police car and whose driver was under arrest remains mobile if it could be moved after the police relinquish control over it. Unlike the vehicle in *Warner*, the vehicle here was operable. Unlike the vehicle in *Kruchek*, it was not being impounded. And unlike the vehicle in *Coleman*, it became the subject of the officer's focus before probable cause to arrest defendant had developed, that is, before Bennett learned about the drugs. The search therefore came within the expansive definition of the automobile exception that has evolved since *Brown* and *Kock*.

Reversed and remanded.