Filed: October 6, 2011

IN THE SUPREME COURT OF THE STATE OF OREGON

STATE OF OREGON,

Respondent on Review,

v.

TYLER JURO KUROKAWA-LASCIAK,

Petitioner on Review.

(CC 07CR1309FE; CA A140430; SC S058898)

On review from the Court of Appeals.*

Argued and submitted on May 3, 2011.

Jay W. Frank, Moule & Frank, Eugene, argued the cause and filed the brief for petitioner on review.

Anna M. Joyce, Assistant Attorney General, argued the cause and filed the brief for respondent on review. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before De Muniz, Chief Justice, and Durham, Balmer, Kistler, Walters, and Linder, Justices.**

WALTERS, J.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.

* Appeal from Douglas County Circuit Court, Joan Glawe Seitz, Judge. 237 Or App 492, 239 P3d 1046 (2010).

** Landau, J., did not participate in the consideration or decision of this case.

WALTERS, J.

In this case, we adhere to prior decisions of this court and decide that the "automobile exception" to the warrant requirement of Article I, section 9, of the Oregon Constitution, does not permit a warrantless search of a defendant's vehicle when the vehicle is parked, immobile, and unoccupied at the time that the police encounter it in connection with a crime.

The state charged defendant with various drug offenses, and defendant filed a motion to suppress evidence that the police had obtained from a warrantless search of his rental van. The state contended that no warrant was required under the automobile exception to Article I, section 9, announced by this court in *State v. Brown*, 301 Or 268, 274, 721 P2d 1357 (1986), or, alternatively, that defendant's companion was in possession of the van and had given her consent to search. The trial court granted defendant's motion to suppress and the state appealed. *See* ORS 138.060(1)(c) (authorizing state's appeal of order granting motion to suppress). The Court of Appeals reversed the trial court's ruling and held that the search was valid under the automobile exception. Defendant sought review, which we allowed. We decide that the automobile exception did not permit the warrantless search of defendant's van and remand the case to the Court of Appeals to decide the issue that it did not reach -- whether the search was permitted by defendant's companion's consent.

We state the facts consistently with the trial court's factual findings and its decision granting defendant's motion to suppress. *See State v. Meharry*, 342 Or 173, 175, 149 P3d 1155 (2006); *State v. Juarez-Godinez*, 326 Or 1, 7, 942 P2d 772 (1997) (both

1

stating standard).

Defendant was gambling at the Seven Feathers Casino on the Cow Creek Indian Reservation in Douglas County when a casino employee began to suspect that he was engaged in money laundering. The casino prohibited defendant from engaging in further cash transactions for a 24-hour period and posted his photograph in its cashiers' cages.[1] The casino also began to monitor defendant's movements by soundless video camera, capturing the events described in the following paragraph.

At approximately 9:17 a.m., defendant attempted a cash transaction at one of the cashier's cages and, in the process, reached through the cage and grabbed his photograph. At approximately 9:30 a.m., defendant left the casino, got in a van, and drove to a gas station operated by the casino. At approximately 9:43 a.m., defendant returned to the casino parking lot, where he parked, got out of his van, and began to walk toward the casino. When defendant was approximately 30 feet from his van, an officer, Deputy Wohls from the Douglas County Sheriff's Department, drove his patrol car to the place where defendant was walking and stopped him.

At approximately 10:09 a.m., another officer, Senior Trooper Bennett of the

---

[1] Federal law prohibits a casino from allowing an individual to make more than $10,000 in cash transactions per day. The casino required any individual approaching that limit to provide identification and, if the individual refused, prohibited the individual from making any cash transactions for a 24-hour period. Because defendant was approaching the cash transaction limit, a casino employee requested identification and, when defendant refused to provide it, told defendant that he was barred from making any cash transactions for 24 hours. Casino officials then distributed a photograph of defendant, taken from surveillance camera footage, to all of the casino's cashiers.

Oregon State Police, who specialized in gaming offenses, arrived at the parking lot and advised that he was taking over the investigation. Bennett had spoken with casino employees about defendant's suspicious activity, but neither Bennett nor Wohls had seen defendant drive the van and neither had reviewed the casino surveillance tape.

Bennett spoke with defendant and recorded their conversation. Bennett informed defendant that he was detaining him on suspicion of money laundering and administered *Miranda* warnings. In response to a question from Bennett about what had happened, defendant said that he had seen his picture in the casino cage and taken it. When asked about the van, defendant said that he had rented it in California and was going to Spokane to pick up his son. When asked about the amount of cash that defendant had on his person and in the van, defendant first replied that he had $4,500 on him, but later stated that he did not know how much money he had in either location.

Bennett then asked defendant what was in the bag in his pocket and told defendant that it looked like a marijuana pipe. Bennett asked defendant how many drugs he had on him and in the van. When defendant did not respond, Bennett told defendant that he was under arrest for disorderly conduct and third-degree theft (for taking the photograph from the casino) and that he would be taken to the Douglas County Jail. Bennett asked defendant for consent to search the van; defendant refused. Bennett told defendant that he believed that defendant was in possession of controlled substances, patted him down, and discerned that the bag in defendant's pocket did not contain a pipe, but instead felt as if it contained credit cards. Bennett asked defendant if he was involved in identity theft; defendant denied that he was.

3

Bennett then told defendant that he was going to jail for disorderly conduct and theft, but that once there he could be cited and released. However, Bennett explained, defendant had another option. If defendant would consent to a search of the van, Bennett might cite him at the casino and release him there. Defendant responded that what Bennett was saying was not true. Bennett asked to search defendant's pockets, the van, and the room at the casino where defendant was staying. Defendant said that he wanted to talk to a lawyer. Bennett told defendant that he was impounding the van and that he would get a search warrant. Wohls interjected that Bennett must inventory the vehicle.

At approximately 10:14 a.m., Wohls took defendant to the Douglas County Jail, leaving defendant's van parked at the casino. Neither Wohls nor Bennett impounded the van, inventoried its contents, or made efforts to obtain a search warrant.

Instead, Bennett continued his investigation and learned that defendant had given the van's keys to his girlfriend, Laura Campbell, and instructed her to lock the van, take care of the family dog, go to the casino's restaurant to eat, and stay put until he returned. At approximately 10:28 a.m., Bennett went into the restaurant to speak with Campbell. Bennett did not record his conversation with Campbell, but the casino's surveillance camera captured silent video of the conversation.

Bennett asked Campbell whether the van contained a large amount of money or drugs. Campbell replied that she did not know of any. Bennett then asked whether there was marijuana in the van; Campbell said that there was. Bennett asked whether the amount of marijuana was over or under an ounce; Campbell replied, "It is

4

probably under, but it could be over a little bit."

Bennett asked Campbell if she would consent to a search of the van. Campbell hesitated and told Bennett that she was not sure if she could consent because she was not listed on the rental agreement. Campbell told Bennett that she had the keys to the van and that it may be her intention to leave. However, Campbell agreed to meet Bennett outside the restaurant, by the van, when she and her children finished their breakfast.

At approximately 11:00 a.m., Campbell met Bennett at the van and recorded his conversation with her. Bennett asked for Campbell's consent to search, and Campbell told Bennett that she was feeling "badgered." Bennett denied that he was badgering Campbell and continued to talk with her. Bennett allowed Campbell to take the dog out of the van and make a telephone call. At approximately 11:15 a.m., Campbell signed a "consent to search" form. Bennett searched the van and found the evidence that was the subject of the later motion to suppress: 77 grams of marijuana, 56 grams of hashish, electronic scales, and approximately $48,000 in cash. After seizing the evidence, Bennett told Campbell that she was not under arrest and gave her directions so that she could drive, in the van, to the Douglas County Jail.[2]

Defendant moved to suppress the evidence discovered in the search, contending that the warrantless search was unlawful under Article I, section 9, of the

---

[2] Bennett never considered Campbell to be a criminal suspect.

Oregon Constitution.[3] The state took the position that the search was permitted by the automobile exception or Campbell's consent. After a hearing, at which the court took testimony from Bennett, defendant, and Campbell, viewed the silent casino surveillance tape, and listened to the conversations that Bennett had recorded, the court rejected both of the state's arguments. As to the automobile exception, the court explained that it did not apply because the van was not moving at the time that the police stopped defendant and developed probable cause to search the van. Specifically, the trial court found that defendant was "about three vehicle parking spaces," or approximately 30 feet, from the van when Wohls stopped him and that defendant was no longer near the van when Bennett arrived at the parking lot and developed probable cause to search it. As to the validity of Campbell's consent, the trial court ruled that Campbell had authority over the van and that her consent was voluntary, but that defendant's prior refusal to give consent negated Campbell's subsequent consent, citing *State v. Weaver*, 214 Or App 633, 168 P3d 273 (2007) and *Georgia v. Randolph,* 547 US 103, 126 S Ct 1515, 164 L Ed 2d 208 (2006).

The state appealed and, with respect to the automobile exception, argued that that exception applied because the evidence before the trial court established that defendant's van had been moving when he drove it into the parking lot and that nothing occurred thereafter to render the van immobile. The state did not contend that the van

---

[3]    Defendant primarily argued that the search was unlawful under Article I, section 9, of the Oregon Constitution, but also cited the Fourth Amendment to the United States Constitution in his motion to suppress. Defendant does not make any arguments in this court based on the Fourth Amendment.

was moving when the officers encountered it or that the officers had seen defendant driving the van before they stopped him.[4]

The Court of Appeals interpreted its prior cases and this court's decision in *State v. Meharry*, 342 Or 173, 175, 149 P3d 1155 (2006), to hold that "a vehicle is 'mobile' for purposes of the automobile exception as long as it is operable." *State v. Kurokawa-Lasciak*, 237 Or App 492, 497-98, 239 P3d 1046 (2010). Given its understanding of that "expansive definition of the automobile exception," the court concluded that the search in this case was valid. *Id.* at 499. The court observed that defendant's van could be moved after the police relinquished control over it and it was not being impounded.[5]

Defendant sought review, which we allowed. In this court, neither defendant nor the state adopts the Court of Appeals' interpretation of *Meharry*. Defendant contends that the automobile exception to the warrant requirement of Article I, section 9, of the Oregon Constitution precludes the warrantless search of a car that is parked, immobile, and unoccupied when the police encounter it in connection with a crime, and that *Meharry* is consistent with that rule. The state frames the issue for our

---

[4] At the hearing on the motion to suppress, the trial court reviewed the casino surveillance tape, which showed defendant driving the van out of and back into the casino parking lot. Bennett testified that he reviewed the casino surveillance tapes after the search was complete.

[5] The Court of Appeals also observed that the van became the subject of the officer's focus before probable cause to arrest defendant had developed (which occurred when Campbell told him that the van could contain more than an ounce of marijuana). *Kurokawa-Lasciak*, 237 Or App at 499.

7

decision as presenting a question "left open" after this court's decision in *Meharry* --

"when officers first encounter a car in connection with a crime, does the automobile exception's 'mobility' requirement demand evidence that the officers saw the car being driven, or is it enough that (1) officers develop probable cause that the car contains evidence of a crime, and (2) no evidence exists that the car is inoperable?"

The automobile exception is one of "'the few specifically established and carefully delineated exceptions to the warrant requirement[]'" of Article I, section 9.[6] *Meharry*, 342 Or at 177 (quoting *State v. Bridewell*, 306 Or 231, 235, 759 P2d 1054 (1988)). The constitution requires a warrant so that a disinterested branch of government -- the judicial branch -- and not the branch that conducts the search -- the executive branch -- makes the decision as to whether there is probable cause to search. *State v. Brown*, 301 Or 268, 274, 721 P2d 1357 (1986) (citing *State v. Quinn,* 290 Or 383, 390-91, 623 P2d 630 (1981)).

This court first recognized the automobile exception to the warrant requirement of Article I, section 9, in 1986, in *Brown*, 301 Or at 276.[7] In that case, the

---

[6] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

[7] On the same day that it decided *Brown*, the court also decided *State v. Bennett*, 301 Or 299, 721 P2d 1375 (1986), in which it held that the automobile exception articulated in *Brown* permitted officers to search closed containers found in the trunk of the defendant's car.

8

police made a roadside stop of a mobile vehicle. The court reasoned that,

> "if police have probable cause to believe that a person's automobile, which is mobile when stopped by police, contains contraband or crime evidence, the privacy rights of our citizens are subjected to no greater governmental intrusion if the police are authorized to conduct an immediate on-the-scene search of the vehicle than to seize the vehicle and hold it until a warrant is obtained."[8]

*Id.* Therefore, the court decided, the constitution permits an exception to the warrant requirement when (1) the automobile is mobile at the time it is stopped by police, and (2) probable cause exists for the search of the automobile.

The court drew that line to give the police "clear guidelines by which they can gauge and regulate their conduct rather than trying to follow a complex set of rules dependent upon particular facts regarding the time, location and manner of highway stops." *Id.* at 277. The only exigent circumstance that the court required was the mobility of the automobile at the time of the stop. It did not matter, the court said,

> "whether the passenger could have taken over the custody of the car (which he eventually did), whether the police had adequate personnel to back-up the arrest, whether a tow truck was available, whether a magistrate was available by telephone or otherwise, or whether a threatening crowd gathered, etc. All the trial judge needed to find was what he did find: (1) the car was mobile at the time it was stopped by the police; and (2) the police had probable cause to believe that the car contained contraband or crime evidence."

*Id.* at 278 (internal footnote omitted).

---

[8] In that particular respect, the court expressly followed the reasoning of the United States Supreme Court and cited *Carroll v. United States*, 267 US 132, 45 S Ct 280, 69 L Ed 543 (1925). The court emphasized, however, that it was deciding *Brown* independently of the federal standard and citing that case only because it found it persuasive in that particular regard. 301 Or at 274. *See State v. Caraher*, 293 Or 741, 750, 653 P2d 942 (1982) (state not constrained by federal law when interpreting its own constitutional provisions).

9

However, the court noted, a neutral magistrate's evaluation of probable cause continued to be a desired goal, and the court did not anticipate that the police would rely on the automobile exception when advances in technology permitted quick and efficient electronic issuance of warrants. The court explained that,

> "[i]n this modern day of electronics and computers, we foresee a time in the near future when the warrant requirement of the state and federal constitutions can be fulfilled virtually without exception. All that would be needed in this state would be a central facility with magistrates on duty and available 24 hours a day. All police in the state could call in by telephone or other electronic device to the central facility where the facts, given under oath, constituting the purported probable cause for search and seizure would be recorded. The magistrates would evaluate those facts and, if deemed sufficient to justify a search and seizure, the magistrate would immediately issue an electronic warrant authorizing the officer on the scene to proceed. The warrant could either be retained in the central facility or electronically recorded in any city or county in the state. Thus, the desired goal of having a neutral magistrate could be achieved within minutes without the present invasion of the rights of a citizen created by the delay under our current cumbersome procedure and yet would fully protect the rights of the citizen from warrantless searches."

*Id*. at 278 n 6.

Two justices dissented. They argued that an automobile exception to the warrant requirement could be justified only if the state could prove the existence of an actual, as opposed to an assumed, exigency. Whether there was a sufficient risk that evidence would be lost if the police were required to obtain a warrant to search an automobile should be determined, as it is when courts assess the existence of other exigent circumstances, on a case-by-case basis. *Id*. at 292 (Linde, J., dissenting). Although the dissent welcomed the majority's suggestion that its decision was a temporary accommodation subject to change in the near future when technology would

10

permit neutral magistrates to fulfill the role that the constitution required, the dissent thought that the state would provide and use available technology more expeditiously if the court would enforce the warrant requirement rather than recognize a new exception to it. *Id*. at 293-94 (Linde, J., dissenting).

Some three months after its decision in *Brown,* the court decided *State v. Kock*, 302 Or 29, 725 P2d 1285 (1986). In *Kock*, the court adhered to the "bright line" that it had drawn in *Brown*. 302 Or at 33. The court reiterated that that line gave the police clear guidelines and added that it also satisfied the needs of citizens of this state "to have their constitutional rights spelled out as clearly as possible." *Id*.

In *Kock*, the police received a tip that the defendant was stealing from his workplace and went to the defendant's workplace to investigate. There, the police observed the defendant's parked and unoccupied vehicle for several hours. After the defendant emerged with a package, placed it in his vehicle, and returned to work, police searched the vehicle without a warrant and found stolen merchandise.

The court began its analysis by acknowledging that, logically, the defendant's parked vehicle was as capable of mobility as was a vehicle that was moving when it was stopped by the police, and that the United States Supreme Court had interpreted the warrant requirement of the federal constitution to permit warrantless searches of automobiles "capable" of mobility. *Id*. at 32.[9] However, the court

_____

[9] The court cited *Carroll*, 267 US 132, "and its progeny" for that proposition. *Kock*, 302 Or at 32. One of the cases included in that description was *California v. Carney*, 471 US 386, 392-93, 105 S Ct 2066, 85 L Ed 2d 406 (1985). In *Carney*, the Supreme Court explained the bases for the federal automobile exception:

11

specifically elected not to adopt the Supreme Court's rationale or to extend the Oregon exception. Instead, the court chose to "draw the so-called bright line of *Brown* just where we left it in that case[.]" *Id*. at 32-33. The court decided that

> "any search of an automobile that was *parked, immobile and unoccupied at the time the police first encountered it in connection with the investigation of a crime must be authorized by a warrant* issued by a magistrate or, alternatively, the prosecution must demonstrate that exigent circumstances other than the potential mobility of the automobile exist."

*Id*. at 33 (emphasis added).

In concluding that the warrantless search of the defendant's car was unconstitutional, the court acknowledged that the line that it had drawn reflected neither the position of those who believed that the constitution permitted the police to conduct a warrantless search of any operational vehicle nor those who believed that the constitution did not permit an automobile exception to the warrant requirement in the absence of a particularized showing of exigency. The court declared that it had selected that line deliberately and that it would not "stretch the automobile exception" to permit the search of a car that was not mobile when the police encountered it. *Id.* at 33. "*Brown*," the court

---

> "When a vehicle is being used on the highways, *or if it is readily capable of such use and is found stationary* in a place not regularly used for residential purposes -- temporary or otherwise -- the two justifications for the vehicle exception come into play. First, the vehicle is *obviously readily mobile by the turn of an ignition key, if not actually moving*. Second, there is a reduced expectation of privacy stemming from its use as a licensed motor vehicle subject to a range of police regulation inapplicable to a fixed dwelling. At least in these circumstances, the overriding societal interests in effective law enforcement justify an immediate search before the vehicle and its occupants become unavailable."

471 US at 392-93 (internal footnote omitted) (emphases added).

said, "sets the outer limit for warrantless automobile searches without other exigent circumstances." *Id*.

In this case, the Court of Appeals, as noted, did not apply the automobile exception as articulated in *Brown* and *Kock*. The Court of Appeals rested its decision on what it believed to be a more "expansive definition of the automobile exception that [had] evolved since *Brown* and *Kock*" -- a definition that the court took from its understanding of its prior cases and this court's decision in *Meharry*. *State v. Kurokawa-Lasciak*, 237 Or App 492, 499, 239 P3d 1046 (2010). *Meharry*, the Court of Appeals posited, stands for the proposition that "a vehicle is 'mobile' for purposes of the automobile exception as long as it is operable." *Id*. at 497-98. Although neither defendant nor the state concur with that reading of *Meharry*, it obviously is key to our resolution of this case, and we proceed to consider it.

In *Meharry*, a fire chief saw the defendant drive erratically and nearly cause a collision. The chief began to trail the defendant and called the police department to report his observations. A police officer responded to the call and saw the fire chief and the defendant pass in front of him as he drove out of the police station. Before the officer could overtake the defendant, she pulled into a store parking lot and brought her van to a halt. The officer pulled in behind the defendant, blocking her from leaving. The officer then followed the defendant into a store, saw that she was lethargic and incoherent, conducted field sobriety tests, and arrested her for driving under the influence of intoxicants. Thereafter, the officer searched the defendant and her van, finding evidence that the defendant sought to suppress. The Court of Appeals held that the search was

13

unconstitutional because the relevant encounter had occurred when the officer confronted the defendant in the store, and there was no exigency relating to the mobility of the van at that time. This court reversed. *State v. Meharry*, 201 Or App 609, 618, 120 P3d 520 (2005), *rev'd*, 342 Or 173, 149 P3d 1155 (2006). To explain the Court of Appeals' error, the court stated and applied the holdings in *Brown* -- "that police officers may search a vehicle if they have 'probable cause to believe that a lawfully stopped automobile which was mobile at the time of the stop contains contraband or crime evidence'" -- and in *Kock* -- that the automobile exception did not apply, because the vehicle was "parked, immobile and unoccupied at the time the police first encountered it in connection with the investigation of a crime[.]" *Meharry*, 342 Or at 177-79 (quoting *Brown*, 301 Or at 277, and *Kock*, 302 Or at 33). First, the court stated, the police officer had encountered the van in connection with a crime when he saw the defendant driving it past the police station, and the van was mobile at that time. *Id*. at 179. Second, the search had occurred shortly after the officer made that observation and parked his car behind the defendant's van, and "[n]othing occurred between [the encounter] and the search that rendered the van immobile." *Id*. at 180. The court explained that

> "[the officer] had not impounded the van, and there was no physical or mechanical impediment to the van's being driven away once [the officer] relinquished control over it. In short, the van remained mobile and the exigency continued."

*Id*.

In response to the defendant's argument that the case was not on all fours with *Brown* because the officer in *Meharry* had not caused the defendant to pull over to

14

the side of the road as the officer in *Brown* had done, the court said that the officer in *Meharry* had effectuated a stop of the defendant by parking his car behind her van and preventing her from leaving. The court equated the officer's action with a roadside stop because the officer's action prevented the defendant from leaving. The court stated:

> "It is true, as defendant notes, that [the officer] did not effect a stop, as the officer did in *Brown,* by causing defendant to pull her van over to the side of the road and bring it to a stop. [The officer], however, did stop defendant when he followed her into the Zip Trip parking lot and parked his police car behind her van, preventing her from leaving once she finished her errand. *See State v. Holmes,* 311 Or 400, 409, 813 P2d 28 (1991) (defining when a 'seizure' occurs for the purpose of Article I, section 9). The issue that defendant's argument thus poses is whether stopping an otherwise mobile car from resuming its journey (as [the officer] did here) differs for purposes of the automobile exception from causing a moving car to come to a stop (as the officer did in *Brown*).

> "We cannot see a difference, for constitutional purposes, between the two situations."

*Meharry*, 342 Or at 180.

As the state seems to acknowledge, the court in *Meharry* did not dispense with the *Brown* and *Kock* requirement that, to qualify for the automobile exception, the vehicle that the police search must be mobile at the time that the police encounter it in connection with a crime. The court cited and applied that requirement and held that the defendant's van was mobile at the time that the police encountered it in connection with a suspected crime. The court discussed the van's continuing operability at the time of the search only to correct the Court of Appeals' statement that the initial exigency no longer existed when the police searched the van. By noting that the defendant's van, which initially was mobile, remained operable at the time of the search, the court did not intend

15

to eliminate the requirement of the automobile exception that the vehicle be mobile at the time of the initial encounter or to replace it with a requirement of operability at the time of the initial encounter.

When the court decided *Brown* and *Kock* in 1986, it expressly rejected operability as the basis for the automobile exception to the Oregon Constitution.[10] We would be overruling those cases, not answering a question that was "left open" in *Meharry*, if we were to hold, as the state requests, that to invoke the automobile exception, the state need demonstrate only that "no evidence exists that the car is inoperable" at the time of the encounter. We acknowledge the logic of the state's position -- that it is just as likely that a person in control of an operable car will drive off with evidence or contraband as will a person in control of a car that was mobile at the time of the initial encounter and that remains mobile thereafter. But we also are cognizant that, when the court recognized the automobile exception in 1986, it was careful to recognize a limited exception to the constitutional requirement that a neutral magistrate, and not officers in the field, determine the existence of probable cause to search. The court drew the "bright line" that it did to benefit both the police and the citizens of this state. If we were to alter that line, we would be overruling those cases. Neither party has asked us to do so, nor demonstrated a basis for us to do so. *See Farmers Ins. Co. v. Mowry*, 350 Or

---

[10] In doing so, the court in *Kock* called attention to the contrast between the Oregon exception and that permitted under the federal constitution. 302 Or at 32-33. In *Meharry*, this court again noted that the Oregon mobility requirement distinguishes the Oregon automobile exception from that permitted by the federal constitution. 342 Or at 178 n 1.

686, ___ P3d ___ (2011) (discussing doctrine of *stare decisis* and explaining that party seeking to change precedent must persuade court to do so). Therefore, we adhere, as the court did in *Meharry*, to the line that the court drew in *Brown* and *Kock*.

With that understanding of the automobile exception, determining whether that exception permitted the search in this case is not difficult. The trial court found that when Wohls stopped defendant, defendant was approximately 30 feet from his van, which was parked, immobile, and unoccupied, and that, when Bennett questioned defendant, defendant was no longer near the van. As the state now acknowledges, there was no evidence from which the trial court could have found that defendant's van was mobile when Wohls or Bennett encountered it in connection with a crime. Therefore, we conclude that the trial court was correct that the automobile exception did not permit the warrantless search of defendant's van.

That does not mean, however, that the trial court correctly suppressed the evidence. The Court of Appeals did not reach the state's argument that the search was constitutionally authorized by Campbell's consent. We remand the case to the Court of Appeals to decide that issue.

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.