Argued and submitted April 25, 2014, reversed September 30, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

AARON WILLIAM BELANDER,
*Defendant-Appellant.*

Wasco County Circuit Court
1200115CR; A152171

360 P3d 580

Daniel C. Bennett, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Sarah M. Villanueva, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Nakamoto, Presiding Judge, and Egan, Judge, and Flynn, Judge.*

FLYNN, J.

_____

* Flynn, J., *vice* Armstrong, P. J.

## FLYNN, J.

Defendant appeals from a judgment convicting him of felon in possession of a firearm, ORS 166.270. He challenges the trial court's denial of his motion to suppress evidence obtained during a warrantless search of his vehicle. The trial court concluded that the search was justified under the "automobile exception," which the Oregon Supreme Court has said authorizes warrantless searches when officers have probable cause to search a vehicle that is "mobile at the time that the police encounter it in connection with a crime." *State v. Kurokawa-Lasciak*, 351 Or 179, 192, 263 P3d 336 (2011). Defendant argues that the automobile exception does not justify the search in this case because the officers first encountered defendant's mobile car in connection with a welfare check, and only later, after defendant had parked the car and walked away from it, did the officers begin to investigate a crime. The state responds that the automobile exception should apply to searches when—as here—officers see a car drive down the street and, at that point, are interested in stopping the car for what the state describes as "other lawful police conduct"—here, a "welfare check" on one of the occupants— if, shortly after the stop, officers develop probable cause to believe that the car contains evidence of criminal activity. We conclude that the automobile exception did not authorize the warrantless search of defendant's car in this case because the car was not mobile when the officers encountered it "in connection with a crime." Accordingly, we reverse.

We review a court's denial of a suppression motion for legal error and defer to the court's findings of historical fact if there is evidence to support them. *State v. Soto*, 252 Or App 50, 51, 284 P3d 1254, *rev den*, 353 Or 127 (2012). In the absence of express trial court findings, we resolve factual disputes in a manner consistent with the court's ultimate conclusions. *State v. Hall*, 339 Or 7, 10, 115 P3d 908 (2005). We describe the facts here according to that standard.

## I. BACKGROUND

On May 9, 2012, Detective Sergeant McNeel of the Wasco County Sheriff's Department received a call from Deputy Sheriff Princehouse of the Hood River County Sheriff's Office. Princehouse told McNeel that he was

receiving text messages from Klomonsky, whom Princehouse and McNeel both knew, and that Klomonsky was "frantic, upset, [and] was talking about needing help and that she was worried about her friend, [Kent]."[1] Klomonsky reported that she and Kent were in a silver Hyundai driving toward Foley Lakes. One of Klomonsky's texts described defendant as "a very bad man, who is driving [with] no license and I believe [has] drugs and guns." Princehouse conveyed to McNeel the content of the messages "in general," and that he wasn't sure what was going on but that "something was amiss." Princehouse and McNeel agreed that McNeel should conduct a "welfare check," and McNeel started driving toward Foley Lakes. Meanwhile, McNeel contacted Detectives Hall and Rosebraugh and asked for "assistance on a welfare check."

The officers located the silver Hyundai when it was parked in an apartment complex parking lot. Rosebraugh watched the silver Hyundai drive out of the parking lot with Klomonsky (whom Rosebraugh recognized) in the back seat. The officers followed the silver Hyundai, which drove to a fast food restaurant and parked in the parking lot. All three occupants were climbing out of the car as the officers arrived. Defendant was walking toward the restaurant entrance when Rosebraugh asked to speak with him, and defendant walked back towards the car. When Klomonsky said she needed to use the restroom, Rosebraugh followed her inside. While Rosebraugh was inside the restaurant with Klomonsky, McNeel spoke to defendant and Kent. McNeel testified that, at that point, he was "still kind of looking at it as a welfare check."

Inside the restaurant, Klomonsky told Rosebraugh that there was a red backpack in the car that "had drugs and guns in it." Rosebraugh went outside immediately and privately relayed the information to McNeel and Hall. The officers asked Kent for consent to search the backpack, because she initially claimed it was hers. When Kent declined to give consent, Rosebraugh called an Oregon State Police trooper with a drug detection dog to come to the scene. The trooper was approximately 20 miles away. The dog arrived and

---

[1] In the record, Kent is also referred to as Carter. For consistency, we will refer to her as Kent.

alerted that the backpack contained drugs, and the trooper immediately began searching it. McNeel testified that they "could certainly" have obtained a warrant before the trooper opened the backpack but that he understood the automobile exception to make a warrant unnecessary.

At a hearing on defendant's motion to suppress, the trial court found that "when [officers] first encounter[ed] these folks it's not to investigate a crime. It is simply to make sure that Ms. Kent is okay." At another point, the court again emphasized its finding that when officers initially encountered the car it was to do a welfare check:

> "It is a mobile car when the police first encounter it for the reasons they encountered it, which was to do a welfare check, that from that point forward the investigation turned criminal within minutes, if not moments, that when the officers decided to do the welfare check they did have probable cause to believe a crime had been committed. It's just that that wasn't the business they were about. They have probable cause to believe the car contained evidence of a crime. Again, it's just not what they were about."

The court ultimately concluded, however, that "[i]n this case when the officers decide there is probable cause to search the vehicle[,] the vehicle is mobile."

After the trial court denied defendant's motion to suppress, defendant waived his right to a jury trial and tried his case to the court. He was found guilty of one count of felon in possession of a firearm on the basis of stipulated facts, and the state agreed to dismiss the remaining drug-related counts.

## II. DISCUSSION

We begin by emphasizing the well-established rule that a search or seizure conducted without a warrant violates Article I, section 9, of the Oregon Constitution,[2] "unless

---

[2] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

it comes 'within one of the few specifically established and carefully delineated exceptions to the warrant requirement.'" *State v. Andersen*, 269 Or App 705, 708, 346 P3d 1224, *rev allowed*, 357 Or 595 (2015) (quoting *State v. Bridewell*, 306 Or 231, 235, 759 P2d 1054 (1988)). "One of those exceptions is the exigent-circumstances exception, which allows the police to conduct a warrantless search or seizure if it is supported by probable cause and conducted under exigent circumstances." *Andersen*, 269 Or App at 708. Here, the state did not attempt to prove that actual exigent circumstances justified the search. Rather, the state relied exclusively on the "automobile exception," which the Supreme Court created to be a *"per se* exigency rule." *State v. Brown*, 301 Or 268, 277, 721 P2d 1357 (1986). On appeal, defendant renews his argument that the automobile exception does not apply to justify the search in this case.

As most recently articulated by the Oregon Supreme Court, the automobile exception requires that "the vehicle that the police search must be mobile at the time that the police encounter it in connection with a crime." *Kurokawa-Lasciak*, 351 Or at 192. The court created the Oregon automobile exception to provide the police "clear guidelines by which they can gauge and regulate their conduct rather than trying to follow a complex set of rules dependent upon particular facts regarding the time, location and manner of highway stops." *Brown*, 301 Or at 277. Unfortunately, the lines have not proved to be as clear as the *Brown* court hoped to make them, and further clarification has been necessary.

The first clarification came because of a comment in *Brown* that the facts did not call upon the court to decide whether the automobile exception would apply to the warrantless search of a "parked or impounded automobile." *Id.* at 277. The court almost immediately confronted that question in *State v. Kock*, 302 Or 29, 32-33, 725 P2d 1285 (1986), and concluded

"that any search of an automobile that was parked, immobile and unoccupied at the time the police first encountered it in connection with the investigation of a crime must be authorized by a warrant issued by a magistrate or, alternatively, the prosecution must demonstrate that exigent

circumstances other than the potential mobility of the automobile exist."

In holding that the Oregon automobile exception would not apply to a vehicle "that was parked, immobile and unoccupied at the time the police first encountered it in connection with the investigation of a crime," the court acknowledged that

"[f]orensic advocates can make a good case to draw the warrantless search line elsewhere and have in fact convinced the Supreme Court of the United States to extend the automobile exception to a stationary but operational vehicle in a public parking lot as being as readily mobile as one just stopped on a highway."

*Id.* at 33. But the court declined to "stretch" the Oregon automobile exception that far. *Id.*

Twenty years later, the Oregon Supreme Court clarified that the automobile exception can justify the search of a vehicle that is parked by the time officers stop it for a search if the officer was following a moving vehicle and simply "did not have time to effectuate a stop" while the vehicle was moving. *State v. Meharry*, 342 Or 173, 180-81, 149 P3d 1155 (2006). In *Meharry*, an officer received a report that the defendant was driving erratically, providing reasonable suspicion to believe that the defendant was driving under the influence of intoxicants. *Id.* at 175, 179. The officer spotted the defendant's van, and watched it pull into the parking lot of a convenience store, missing the driveway and driving over the curb. *Id.* at 175. The defendant had walked inside the convenience store by the time the officer stopped her and decided to search the van for evidence of the crime of driving under the influence of intoxicants. *Id.* at 175-76. The state argued that the automobile exception justified the warrantless search, and the court agreed, concluding that the officer stopped the defendant when he prevented her "from continuing her journey" and that the automobile exception did not depend on whether the officer had "time to effectuate a stop before defendant pulled into the Zip Trip parking lot." *Id.* at 180-81.

A. *Mobile Versus Recently Parked*

The trial court viewed this case as closest to the facts of *Meharry* and concluded that, when officers encountered

defendant's car in the "parking lot, even though it's not in motion, I would consider it mobile." There is, indeed, wording in *Meharry* to suggest that a vehicle remains "mobile" when officers watch the driver park the vehicle and walk away from the car. 342 Or at 180 ("Nothing occurred between [the time that the officer observed the van in motion] and the search that rendered the van immobile. *** In short, the van remained mobile and the exigency continued.").

The court's decision in *Kurokawa-Lasciak*, however, dispels the suggestion that *Meharry* means that a recently parked vehicle is "mobile":

> "The court [in *Meharry*] discussed the van's continuing operability at the time of the search only to correct the Court of Appeals' statement that the initial exigency no longer existed when the police searched the van. By noting that the defendant's van, which initially was mobile, remained operable at the time of the search, the court did not intend to eliminate the requirement of the automobile exception that the vehicle be mobile at the time of the initial encounter or to replace it with a requirement of operability at the time of the initial encounter."

351 Or at 192-93. The *Kurokawa-Lasciak* court concluded that the automobile exception could not justify the warrantless search because the defendant's recently parked van was not "mobile" when the officers "encountered it in connection with a crime." *Id.* at 194. As this court emphasized in *Andersen,* the reasoning of *Kurokawa-Lasciak* means that "mobility for purposes of the Oregon exception requires officers to see the car being driven when they first encounter it in connection with a crime." *Andersen,* 269 Or App at 715.

Although the court found that the investigation in this case "turned criminal within minutes, if not moments," *Kurokawa-Lasciak* and *Andersen* preclude us from accepting the proposition that the car was "mobile" after it came to a stop and the encounter turned into one "about" a crime after police spoke with Klomonsky in the restaurant. The court found that, when the officers encountered defendant's moving car, they encountered it only "to do a welfare check," and that investigating a crime "wasn't the business they

were about." Indeed, McNeel testified that, even after defendant parked the car and started to walk away, McNeel was "still kind of looking at it as a welfare check." The court's findings mean that the car was no longer mobile when officers encountered it in connection with a crime.

## B. *Encounter in Connection with a Welfare Check*

The state argues that the automobile exception, nevertheless, should apply to the search of defendant's car, because it should apply whenever officers "stop a mobile vehicle through other lawful police conduct" if the encounter thereafter turns criminal.[3] Here, according to the state, the lawful but noncriminal basis for the stop was the "welfare check."[4] As the state points out, the Supreme Court's original description of the automobile exception did not specify that officers encounter the moving vehicle "in connection with a crime." The court in *Brown* described the automobile exception as applying when the officers have "probable cause to believe that a lawfully stopped automobile which was mobile at the time of the stop contains contraband or crime evidence justif[ying] an immediate warrantless search of the entire automobile for the object of the search, despite the absence of any additional exigent circumstances." 301 Or at 277. The state acknowledges that both *Kurokawa-Lasciak* and *Andersen* describe the automobile exception as applying to vehicles that are mobile when "encountered in connection with a crime," but it urges us to view that phrasing as merely descriptive of the facts of the particular cases and not intended as a substantive element of the automobile exception.

---

[3] The state's proposed rule does not precisely track the facts of this case, in which the officers followed the moving vehicle with an intention to stop it, but the moving vehicle parked before officers actually stopped it. We assume, but do not decide, that the chronology is equivalent to stopping a moving vehicle.

[4] For purposes of the analysis here, we accept the state's assumption that the officers could have lawfully stopped the vehicle for a "welfare check." *See State v. Chambers*, 226 Or App 363, 372, 203 P3d 337 (2009) ("assuming without deciding that" removing defendant from train out of concern for his welfare was "constitutionally permissible"). *But see Sivik v. DMV*, 235 Or App 358, 364, 231 P3d 1177 (2010) (addressing argument that interest in checking on welfare justified stop of motorist under the "emergency aid exception," commenting that it "is an exception that can justify warrantless *searches*" and that "[w]e have never held that it can justify warrantless *stops*, and we need not decide that question in the present case" (emphases in original)).

We decline the invitation to treat the phrase "encountered in connection with a crime" as merely *dictum*. The Supreme Court has repeatedly articulated the automobile exception as requiring that the vehicle is "mobile at the time that the police encounter it in connection with a crime"; *Kurokawa-Lasciak* is only the most recent articulation of that standard. Moreover, both the Supreme Court and this court have treated encountering a mobile vehicle "in connection with a crime" as a substantive element of the automobile exception.

The Supreme Court first used "in connection with a crime" as part of its formulation for the automobile exception in *Kock*, and it appears to have been a dispositive factor for the court in that case. Police in *Kock* suspected that the defendant was stealing from his employer and were waiting in the employer's parking lot when the defendant arrived for work. 302 Or at 31. They watched him walk into work and then, a few hours later, walk out to his car with a box. *Id.* He removed a package from the box, which he tried to conceal behind the passenger seat. *Id.* at 31-32. Although the court's factual discussion is not explicit, it appears that the car in *Kock* was mobile when the officers first encountered it—when they watched defendant arrive at work—but not mobile when they observed behavior that connected the car to the crime of theft for which they were monitoring the defendant. *Id.* at 32. The court held that the automobile exception did not justify the officers' warrantless search of the defendant's car because the exception does not apply when the vehicle is "parked, immobile and unoccupied at the time the police first encountered it in connection with the investigation of a crime." *Id.* at 33. We decline to dismiss that statement as merely *dictum*.

Moreover, twice since *Kurokawa-Lasciak*, we have explicitly rejected the suggestion that the automobile exception can apply when officers encountered a mobile vehicle but not "in connection with a crime." In *State v. Groom*, 249 Or App 118, 119, 274 P3d 876, *rev den*, 352 Or 665 (2012), an officer encountered the defendant's car when it was moving and randomly ran the license plate number. He discovered that the registered owner of the vehicle had an outstanding warrant, but by then had lost sight of the vehicle. *Id.* By the

time that officers located the vehicle, it was parked, and the defendant was standing beside it on the sidewalk. *Id.* We held that the automobile exception could not justify the subsequent warrantless search because,

> "[w]hen [the officer] first encountered the car, it was moving, but the encounter was not 'in connection with a crime'; rather, [the officer] was merely randomly 'running' license plates. The nexus with crime arose only later * * *."

*Id.* at 120. Significantly, that decision followed the Supreme Court's remand for reconsideration in light of its decision in *Kurokawa-Lasciak*. *Id.* Our original decision had accepted the officers' argument that the automobile exception permits officers to "search a parked vehicle if it was moving when the police first encountered it, even if, at that time, police had no suspicion of criminal activity." *Id.* at 120. On remand, we concluded that the Supreme Court's decision in *Kurokawa-Lasciak* required a different answer. *Id.*

We again emphasized the need to connect a mobile vehicle to a crime in *State v. Pirtle*, 255 Or App 195, 196, 269 P3d 625 (2013). In that case, officers were investigating a domestic dispute involving defendant, a convicted felon, when they developed reasonable suspicion that he had a handgun in his pickup truck. One of the officers had seen the pickup truck move a short distance but at that point "did not realize * * * that that was the involved vehicle." *Id.* at 197. We concluded that the automobile exception could not justify the state's later warrantless search of the defendant's pickup truck because the state did not prove that the defendant's vehicle was mobile when first encountered in connection with a crime. *Id.* at 201. We emphasized that the "absolute and unambiguous" distinction between "encountering" a vehicle and "encountering it in connection with a crime," was "essential to *Kurokawa-Lasciak*'s formulation." *Id.*

We recognize that no case has explicitly considered the state's proposed formulation of the automobile exception—that it applies if the vehicle is mobile when officers encounter it in connection with a lawful, even if noncriminal, basis sufficient to support a stop that evolves into a criminal encounter. But *Kock*, *Groom*, and *Pirtle* preclude us from treating as *dictum* the requirement that the vehicle

must be mobile when officers first encounter it "in connection with a crime." Whatever "in connection with a crime" may mean, it cannot mean "in connection with a noncriminal" safety concern.[5]

## C. *Encounter in Connection with Investigating a Crime*

The state argues in the alternative that we should consider the officer's initial encounter with defendant's mobile vehicle to be "in connection with a crime" because of the text messages that Klomonsky sent to Princehouse. Those messages included the information that defendant was "a very bad man, who is driving [with] no license and I believe [has] drugs and guns." However, McNeel did not testify that Princehouse conveyed those details to him. Rather, he testified that Princehouse conveyed the content of Klomonsky's numerous text messages "in general" and specified that he was unsure what was going on but that "something was amiss." More significantly, the trial court specifically and repeatedly found that the officer's encounter with the moving vehicle was "not to investigate a crime" but "simply to make sure that Ms. Kent is okay." That finding is dispositive because the relevant focus must be on the information Princehouse shared with McNeel. The purpose of the automobile exception is to provide the police "clear guidelines by which they can gauge and regulate their conduct[,]" *Brown*, 301 Or at 277, and information known only to others is of no value to investigating officers who must decide whether they need to obtain a warrant before searching a vehicle. The investigating officers did not encounter defendant's mobile car in connection with a crime.

Reversed.

---

[5] We recognize that a few cases—in which the question was not in dispute—suggest that the automobile exception could apply to vehicles that officers stop in connection with a traffic infraction. *See State v. Watson*, 353 Or 768, 785 n 19, 305 P3d 94 (2013); *State v. Tovar*, 256 Or App 1, 14, 299 P3d 580, *rev den*, 353 Or 868 (2013); *State v. Smalley*, 233 Or App 263, 265, 225 P3d 844, *rev den*, 348 Or 415 (2010). But we are not aware of any cases that directly address that question, and we do not decide the question here.