No. 65 October 13, 2016 425

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

DENNY D. GHIM,
*Petitioner on Review.*

(CC C111491CR; CA A152065; SC S063021)

On appeal from the Court of Appeals.*

Argued and submitted November 10, 2015.

Morgen E. Daniels, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Ernest G. Lannet, Chief Defender, Office of Public Defense Services.

Rolf C. Moan, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, Paul L. Smith, Deputy Solicitor General, and Robert M. Wilsey, Assistant Attorney General.

Julia E. Markley, Perkins Coie LLP, Portland, filed the brief for *amicus curiae* American Civil Liberties Union of Oregon, Inc. Also on the brief was Kristina J. Holm.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Baldwin, Brewer, and Nakamoto, Justices.**

KISTLER, J.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

––––––––––––––
\* On appeal from Washington County Circuit Court, Gayle A. Nachtigal, Judge. 267 Or App 435, 340 P3d 753 (2014).

\*\* Linder, J., retired December 31, 2015, and did not participate in the decision of this case.

**KISTLER, J.**

The question in this case is whether an agency's use of an administrative subpoena to obtain defendant's wife's bank records violated Article I, section 9, of the Oregon Constitution. The trial court denied defendant's motion to suppress evidence that the agency uncovered as a result of its subpoena, and the Court of Appeals affirmed. *State v. Ghim*, 267 Or App 435, 340 P3d 753 (2014). Relying on *State v. Johnson*, 340 Or 319, 131 P3d 173 (2006), the Court of Appeals held that defendant had no constitutionally protected privacy interest in the bank records. It followed that the agency's use of an administrative subpoena to obtain those records did not violate Article I, section 9. We allowed defendant's petition for review and now affirm, on different grounds, the trial court's judgment and the Court of Appeals decision.

## I.  FACTS

The state charged defendant and his wife with 17 counts of criminal mistreatment, first-degree theft, and aggravated first-degree theft. Midway through trial, defendant's wife filed a motion *in limine* to exclude copies of her bank records, which the Department of Consumer and Business Services (DCBS) had obtained by administrative subpoena, from being admitted into evidence. Defendant joined in that motion and, throughout the trial, adopted his wife's arguments on that issue.[1] In summarizing the facts, we first describe the evidence brought out at the hearing on that motion—essentially, the circumstances that prompted DCBS to subpoena the wife's bank records and how the information that DCBS discovered as a result of its investigation became part of the criminal proceeding against defendant and his wife. We then describe the motion *in limine*, the arguments that the parties made regarding the motion, the trial court's rulings, and the Court of Appeals decision.

A.  *DCBS investigation*

Ruth Johnson is an investigator for DCBS. In January 2009, Johnson received a call from Von Renchler,

---

[1] Only defendant is a party to this appeal. Because he joined in his wife's motion and arguments on this issue, we refer in this opinion to defendant's wife's motion and related arguments as defendant's motion and arguments.

who had purchased investment properties from defendant and his wife. Von Renchler told Johnson that he and his wife were supposed to be receiving payments on their investment. However, they had received no payments. According to Von Renchler, defendant's wife had said that payments were being sent to the Von Renchlers' bank account by wire transfer, but no funds were transferred to the account. Afterwards, defendant's wife gave the Von Renchlers a check, which her bank refused to honor. Von Renchler told Johnson that he and his wife felt as if defendant and his wife were giving them "the runaround."

After speaking with Von Renchler, Johnson became concerned that defendant and his wife were selling unregistered securities, which DCBS is charged with regulating. Johnson arranged to meet with the Von Renchlers and asked them to bring their records, including copies of checks that they had written to or received from defendant's wife, so that Johnson could begin her investigation. At the meeting, the Von Renchlers discussed their investment with defendant and his wife and gave Johnson copies of the checks that defendant's wife had sent them. Johnson told the Von Renchlers that she would "subpoena [defendant's wife's] bank records to take a look to see what happened to their money, to see if their money had gone where they were told it was going to go." She explained that, if the money had gone where it was supposed to go, then she would speak with defendant and his wife, talk to them about what they were doing, and deal with any issues administratively.

Pursuant to ORS 59.315 and ORS 192.596, Johnson issued three subpoenas to the banks on which defendant's wife had written checks to the Von Renchlers.[2] Johnson sent copies of the subpoenas by certified mail to defendant's wife. In examining the records that she received in response to the subpoenas, Johnson saw "large deposits coming into [defendant's wife's bank] account," which allowed Johnson

_____

[2] As discussed below, ORS 59.315(1) authorizes DCBS to subpoena witnesses and to require the production of books, papers, and other documents "[f]or the purpose of an investigation *** under the Oregon Securities Law." ORS 192.596(1) authorizes financial institutions to disclose their customers' financial records to state agencies pursuant to a statutorily authorized administrative subpoena.

"to identify [other] individuals that [she] believed were possibly making investments with [defendant and his wife]." Johnson then spoke with the persons whom she had identified from the bank records. She also spoke to property owners in Washington, where the investment properties were supposedly located, and she collected information from government agencies to determine whether the investment properties existed. Finally, in reviewing the bank records that she received, Johnson came across questionable financial transactions involving defendant's mother, who was the subject of a guardianship.

During the year in which Johnson pursued her investigation for DCBS, she did not contact the Von Renchlers' attorney. When asked why she had not done so, she explained that the Von Renchlers' attorney was "dealing with a bad check [from defendant's wife], with trying to get payment." In her view, that matter "had nothing to do with what [she] was looking at," which was "whether we were having a sale of an unlicensed, unregistered security in the State of Oregon."

In March 2010, more than a year after Johnson began her investigation, the Von Renchlers asked Johnson if telling the police about the bad check they had received from defendant's wife would impede her investigation. Johnson said that it would not, and she added that the Von Renchlers could mention her name if they filed a police report. They did, and an officer contacted Johnson regarding her investigation. Before then, Johnson had not had any contact with any law enforcement agency.

B.  *Defendant's motion in limine*

As noted, the state charged defendant and his wife with 17 counts of criminal mistreatment, first-degree theft, and aggravated first-degree theft.[3] The first day of trial, the state called 11 witnesses. Most of those witnesses were persons to

---

[3] Before trial, the Von Renchlers recovered their investment from defendant and his wife. Although the Von Renchlers testified at trial, their transactions with defendant and his wife did not give rise to any criminal charge. Rather, defendant and his wife's transactions with other investors gave rise to the theft and aggravated theft charges, and defendant and his wife's handling of his mother's finances gave rise to the criminal mistreatment charges. As noted below, the trial court found defendant guilty of two of the 17 counts. The trial court found defendant's wife guilty of all 17 counts. Only defendant's appeal is before us.

whom defendant and his wife had sold investment properties. We assume, as the parties do, that, except for the Von Renchlers, those witnesses were persons whom Johnson had identified as a result of reviewing the subpoenaed bank records.

The second day of trial, defendant filed a document captioned "motion *in limine*," in which he asked the court "to exclude from evidence bank records of defendant['s wife] as having been seized without proper court process." Defendant contended that, "[e]ven if properly obtained under state administrative process, *** that information [may not] be admitted against defendant [in] the criminal proceeding given privacy protections under Oregon statutory and constitutional provisions." Although defendant asked the court to keep the bank records from being admitted, he did not ask the court to strike the testimony of the 11 witnesses who had testified the day before, nor did he ask the court to strike any exhibit offered in connection with that testimony.

The parties addressed defendant's motion *in limine* at three separate points during the trial, and the issues evolved as the trial progressed. The parties first discussed the motion shortly after it was filed. That discussion was fairly cursory. The prosecutor explained that the records had been obtained pursuant to statutorily authorized administrative subpoenas and that he was not aware of any limitation on obtaining bank records that way. Relying on Canadian authority, defendant responded that he had a constitutionally protected privacy interest in his wife's bank records. He reasoned that an administrative subpoena lacked the procedural and substantive protections associated with a search warrant. He acknowledged, however, that the victims could choose to disclose their bank records and that he and his wife "los[t] any privacy protection when they send a check out to somebody."

The trial court did not find defendant's Canadian authority persuasive, and it reasoned that, even if DCBS could not issue an administrative subpoena for the banks' records, the prosecutor could subpoena the custodians of the records to appear as witnesses at trial and bring the records with them. Based on that reasoning, the court tentatively denied defendant's motion *in limine*, and the trial continued.

At the end of the second day of trial, the parties returned to the motion *in limine*. The prosecutor advised the court that, on examining the subpoenas that DCBS had issued, he realized that Johnson had served the subpoenas on defendant's wife by certified mail rather than personally, as the bank records statutes require. *See* ORS 192.596(2) (authoring banks to disclose a customer's records in response to administrative subpoenas but requiring personal service on the customer). The prosecutor also noted that the motion *in limine* was, in effect, a motion to suppress. He argued that, if defendant had filed a motion to suppress before trial, as other statutes required, the state could have reissued the subpoenas and served them properly. The prosecutor argued that the court could simply deny defendant's motion *in limine* as untimely. In lieu of doing so, however, the prosecutor suggested continuing the trial and allowing the state to issue a second set of subpoenas for the bank records.

The trial court agreed that defendant's motion *in limine* was effectively an untimely motion to suppress. It also agreed that, if defendant had filed a timely pretrial suppression motion, the state could have cured any service error. Rather than deny defendant's motion as untimely, the court continued the trial for a month and gave the state the opportunity to subpoena the records a second time. The prosecutor noted that he expected that defendant would argue that the second set of subpoenas was the fruit of the poisonous tree, but he asserted that the state inevitably would have discovered the records if the service error had been identified earlier. The trial court agreed.

Defense counsel suggested that the state could get the custodians of the bank records to recertify the banks records, "but [proposed that the state should] do it through a court subpoena so they [the custodians] don't have to recopy everything." After suggesting a second time that the prosecutor could issue a subpoena *duces tecum* for the records that DCBS previously had obtained, defense counsel explained, "I'm not really concerned about the form of this subpoena here because my argument is going to be that it really doesn't matter, it's already been tainted."

The court continued the case for approximately a month, and the prosecutor issued subpoenas *duces tecum* pursuant to ORS 136.583 on the banks in which defendant and his wife held accounts.[4] The subpoenas were personally served on defendant and his wife, and the custodians produced the requested bank records. Those records consisted of account applications, monthly account statements, notices of overdrafts, copies of checks written to third parties, deposit slips, and copies of certified checks deposited in defendant and his wife's bank accounts.[5]

When the trial resumed, the parties returned to defendant's motion a third time. By this time, defendant had filed a memorandum in support of the motion *in limine*, which he now characterized as a motion to suppress. The memorandum argued that, under the Oregon Constitution, defendant and his wife had a constitutionally protected privacy interest in her bank records and that "[t]hese subpoenas from the State amounted to search warrants without probable cause." In arguing that motion, defendant contrasted health care records with bank records. He contended that, even though medical patients lack a constitutionally protected privacy interest in their health care records, bank records are different. In defendant's view, the account holder owns the bank records, which by tradition, policy, and statute have been kept "secret, protected." The state responded that, as a matter of property law, a customer has no ownership interest in bank records. Rather, the bank creates and maintains the records so that it can administer its customers' accounts accurately. The trial court agreed with the state, although it noted that the parties appeared to acknowledge that Johnson had not followed the statutorily required procedure for subpoenaing the bank records and that the state had sought to cure that error by subpoenaing the records a second time.

---

[4] Both the district attorney and the defense counsel may subpoena witnesses to appear at a criminal trial. *See* ORS 136.565 (district attorney); ORS 136.567 (defense counsel). Those subpoenas may require the witness either to bring books, papers and documents with them to trial or to produce those documents before trial. ORS 136.580; *see also* ORS 136.583 (authorizing production of out-of-state documents if certain requirements are met).

[5] Defendant does not contend that the bank records that the custodians produced differed in any material way from the records that they produced in response to DCBS's administrative subpoenas.

The state called Johnson, who confirmed that she had not served the initial administrative subpoenas personally on defendant's wife but had sent them instead by certified mail. Johnson also testified, however, that defendant's wife had acknowledged receipt of the subpoenas. Finally, Johnson testified that, if she had been aware of the service error, she would have cured the problem by reissuing the subpoenas. The prosecutor, for his part, represented that, in the course of pursuing the report that the Von Renchlers had filed with the police, the district attorney's office would have subpoenaed the bank records if Johnson had not already done so.

The trial court recognized that, under ORS 192.606(5), "[e]vidence obtained in violation of ORS 192.583 to 192.607 [the bank records statutes] is inadmissible in any proceeding." The court reasoned that, even though DCBS had not served the administrative subpoenas personally on defendant's wife as ORS 192.596(2) requires and even though ORS 192.606(5) prohibits the admission of bank records obtained in violation of the bank records statutes, ORS 192.606(5) did not prohibit DCBS or the state from serving a second set of subpoenas on the banks to obtain the same records. Regarding defendant's fruit-of-the-poisonous-tree argument, the trial court agreed with the state that the Von Renchlers' complaints to both DCBS and the police had led to those agencies' efforts to investigate defendant and his wife's sales of investment properties, that the Von Renchlers' complaints were independent of any information that was later learned as a result of Johnson's administrative subpoenas, and that the bank records inevitably would have been discovered.[6] The court accordingly admitted the records. After considering all the evidence, the

---

[6] In reaching that conclusion, the trial court assumed that, even if the bank records were inadmissible under ORS 192.606(5), that statute did not preclude admitting the testimony of the witnesses who had been discovered as a result of the subpoenaed bank records. Cf. *United States v. Ceccolini*, 435 US 268, 98 S Ct 1054, 55 L Ed 2d 268 (1978) (holding that, for Fourth Amendment purposes, testimony offered by witnesses discovered as result of illegal search may be attenuated from that illegality). Defendant has not specifically challenged that assumption, although the second memorandum that he filed in support of the motion *in limine* asserted generally that all evidence derived from Johnson's subpoena should be excluded.

trial court found defendant guilty of two of the 17 counts and not guilty of the remaining 15 counts.[7]

## C.  *Defendant's appeal*

Before the Court of Appeals, defendant argued two propositions. First, he contended that, under Article I, section 9, he had a protected privacy interest in his wife's bank records. Second, he argued that, even though the legislature had authorized government agencies to obtain bank records, the resulting statute was unconstitutional "without either a warrant or probable cause and a warrant exception." In arguing the latter point, defendant urged the Court of Appeals to follow a Washington Supreme Court decision, which had held that the Washington Constitution prohibited an agency with both regulatory and criminal investigative authority from issuing a subpoena that was not subject to review by a neutral magistrate. *See State v. Miles*, 160 Wash 2d 236, 247-49, 156 P3d 864 (2007).[8] It followed, defendant contended, that DCBS's use of an administrative subpoena to obtain his wife's bank records violated Article I, section 9, of the Oregon Constitution.[9]

---

[7] The trial court found defendant guilty of first-degree theft from the Woos (count 16) and aggravated first-degree theft from Kang (count 17). Both the Woos and Kang testified the first day of trial, before defendant filed the motion *in limine* to exclude his wife's bank records. As noted, defendant did not move to strike either the Woos' or Kang's testimony. The state, however, has not argued that, in light of those victims' unchallenged testimony, any error in admitting the bank records was harmless, and we do not consider that issue.

[8] In *Miles*, a state agency investigating a securities violation subpoenaed a bank for its customer's records. The agency did not notify the customer of the subpoena, and it directed the bank not to tell the customer that it had subpoenaed the records. 160 Wash 2d at 241. The agency also asked the bank to respond quickly to the subpoena because the statute of limitations for prosecuting theft was about to expire. *Id*. The court held that the Washington Constitution required the intervention of a neutral magistrate, especially when an agency is investigating criminal charges. *Id*. at 247-49.

[9] At one point in his brief, defendant recognized that the bank records statutes "correlate with the bounds of legal and social norms relating to bank records in Oregon" and thus mark the extent of the privacy that Article I, section 9, protects. And he acknowledged that "an administrative agency may gain access to such records in the course of enforcing the rules that the agency is charged with enforcing." Although defendant's argument was not completely clear, he appears to have concluded, in reliance on the Washington decision in *Miles*, that an administrative subpoena issued without the supervision of a neutral magistrate violated Article I, section 9.

In the Court of Appeals, defendant did not raise three issues regarding the second set of subpoenas. First, he did not argue that the trial court erred in ruling that the state could issue a second set of subpoenas to cure the statutory service problem with the first set of subpoenas. *See Ghim*, 267 Or App at 438 n 3 (so noting). Specifically, defendant did not argue that either the statutory exclusion provision in ORS 192.606(5) or Article I, section 9, prohibited the state from serving a second set of subpoenas on the banks once it learned that DCBS had failed to serve the first set of subpoenas in compliance with ORS 192.596. Second, defendant did not argue that the second set of subpoenas would be valid only if DCBS reissued them; that is, he did not argue that the second set of subpoenas violated Article I, section 9, because the prosecutor issued them under ORS 136.583 rather than DCBS reissuing them under ORS 59.315(1). Finally, he did not challenge the trial court's ruling that the second set of subpoenas was not the product of the first set of subpoenas. Rather, he took the position in the Court of Appeals that the use of anything less than a warrant or an exception to the warrant requirement to obtain his wife's bank records violated Article I, section 9.

As noted, the Court of Appeals resolved defendant's argument by holding that a customer has no constitutionally protected privacy interest in his or her bank records. 267 Or App at 440-41. It recognized, as defendant argued, that the legislature has required financial institutions to keep their customers' information private, subject to certain exceptions. *Id.* at 441-42 (discussing ORS chapter 192). The court explained, however, that the administrative subpoenas that DCBS issued came within one of those exceptions, and it declined to find in Article I, section 9, a greater degree of privacy than the legislature had granted in the bank record statutes. *Id.* We allowed defendant's petition for review to consider whether DCBS's use of administrative subpoenas to obtain his wife's bank records violated Article I, section 9.

## II.   ARTICLE I, SECTION 9

On review, defendant raises two related but separate issues. The first is whether he has a constitutionally protected privacy interest in records that the bank created

and maintained for its own use. The second is whether, if he has a protected privacy interest in those records, the administrative subpoenas that DCBS issued were an unreasonable search within the meaning of Article I, section 9. We begin with the first issue.

A.   *Protected privacy interest*

Defendant argues that the fact that the bank created and maintained its records for its own use does not necessarily mean he has no protected privacy interest in those records. In his view, both the existence and the extent of his privacy interest turn on three factors: the nature of the information that the bank collected; "the context of the disclosure of the information—including the relationship between the person claiming the privacy interest and the third party that receives the information"; and "the context of the conduct by which the state accessed the information." Put differently, defendant contends that a person can have a protected privacy interest in information held by third parties, the extent of which will vary depending on the contextual factors he identifies.

On that issue, the state does not argue on review that the mere fact that the bank created and maintained its records for its own use necessarily means that defendant has no protected privacy interest in those records. Rather, it recognizes that the question is a contextual one, although it argues that, in this case, context and history lead to only one conclusion: customers have no constitutionally protected privacy interest in their bank records. It necessarily follows, the state concludes, that any required disclosure of those records did not constitute a search and that, as a result, the subpoenas issued by DCBS and the prosecutor did not violate Article I, section 9.

The question whether a person has a constitutionally protected privacy interest in information that a third party collects and maintains for its own use has arisen with increasing frequency, driven in large part by the ability that computers provide to store, aggregate, and analyze vast amounts of data. *See, e.g.*, *United States v. Jones*, 565 US ___, 132 S Ct 945, 181 L Ed 2d 911 (2012) (Sotomayor, J., concurring) (questioning whether, in light of those technological

changes, the Court should revisit its Fourth Amendment cases and recognize a constitutionally protected privacy interest in bank and phone records); Jane Bambauer, *Other People's Papers*, 94 Tex L Rev 205 (2015) (reasoning that the type of information and the use that government makes of it bear on the constitutionality of government action); Christopher Slobogin, *Making the Most of* United States v. Jones *in a Surveillance Society: A Statutory Implementation of Mosaic Theory*, 8 Duke J Const L & Pub Pol'y 1 (2012) (reasoning that justification for searches of third-party data should be roughly proportional to the intrusiveness of the search and recognizing the potential legitimacy of legislative justification).

In this case, the issue arises in the context of records that a bank maintains of its customers' transactions with third parties. Similar issues can arise regarding the phone numbers a person called, cell phone location, and Internet search histories, to name only a few. And the answer to the question whether a person has a constitutionally protected privacy interest in information held by third parties can vary, according to the parties' arguments, depending on contractual and other restrictions that apply to the third party's use and dissemination of the information, general societal norms, and the level of generality with which the government analyzes the data. *See State v. Howard/ Dawson*, 342 Or 635, 640-41, 157 P3d 1189 (2007) (relying on the absence of any property interest or subconstitutional right or relationship that restricted a garbage company's handling of trash once the company collected it in holding that the defendants had no protected privacy interest under Article I, section 9).

The record in this case sheds little light on those issues. For example, although the state and defendant ask us to look to the Internet to find the terms of the agreements that governed the banks' obligation to keep his wife's financial records confidential, those agreements are not part of the record. The record does not disclose the extent, if any, to which defendant's wife agreed to permit the disclosure of her financial information to third parties for various purposes and thus may have diminished any right to privacy she might claim. Similarly, there is no testimony regarding

the customary use of the information held by the bank or the extent to which the bank must disclose financial transactions to federal and state regulators charged with ensuring the solvency of the bank, tax collection, or compliance with limitations on monetary transfers. Accordingly, to the extent that the state argues that defendant had no protected privacy interest in the bank records because those records were subject to state and federal regulatory review, this record does not disclose the extent, if any, to which regulatory review might diminish any right to privacy that defendant had in his wife's records.

If the right to privacy under Article I, section 9, presents a contextual question, as the parties argue, this record contains little evidence that bears on that issue. All that we can tell from this record is that the Oregon legislature has required financial institutions to keep customers' financial transactions confidential, subject to certain exceptions. *See* ORS 192.583 to 192.607. One of those exceptions is the disclosure of customers' financial information in response to administrative subpoenas. ORS 192.596. Given the limited record before us, we conclude that this case provides a poor vehicle for deciding whether defendant had a protected privacy interest in his wife's bank records.[10] We accordingly assume that defendant has a protected privacy interest and turn to the second issue that defendant has raised, whether the administrative subpoenas that DCBS issued to obtain those records for its civil investigation complied with Article I, section 9.

B.  *Administrative subpoenas*

In the trial court, defendant argued that DCBS's use of an administrative subpoena to obtain his wife's bank records violated his Article I, section 9, rights. In his view, only a warrant or an exception to the warrant requirement, coupled with probable cause, would justify requiring the bank to produce his wife's records. He took the same position in the Court of Appeals. In this court, defendant has shifted his position. He now argues that, because the subpoena was

---

[10]  We accordingly do not reach defendant's claim that our decision in *Johnson*, 340 Or at 336, either has no application in the context of bank records or should be reconsidered. We express no opinion on that issue.

a search, "it was subject to the reasonableness requirement of Article I, section 9." He contends that "[a] search is reasonable if it is supported by a warrant, justified by an exception to the warrant requirement, or conducted pursuant to a properly authorized administrative scheme." Defendant notes that DCBS neither obtained a warrant nor sought to come within an exception to the warrant requirement. He also contends that DCBS's subpoenas were not issued pursuant to a properly authorized administrative scheme, apparently on the ground that DCBS failed to "comply with the statute that sets forth the subpoena process required to access bank records."

To the extent that defendant argues on review that only a warrant or an exception to a warrant requirement will justify requiring a third party to turn over another person's records, that argument is difficult to square with this court's cases. This court has long recognized that an administrative subpoena issued as part of a civil investigation will comply with Article I, section 9, as long as the subpoena is "relevant to a lawful investigatory purpose and * * * no broader than the needs of the particular investigation." *Pope & Talbot, Inc. v. State Tax Com.*, 216 Or 605, 614-15, 340 P2d 960 (1959);[11] *see Dept. of Rev. v. Universal Foods Corp.*, 311 Or 537, 545-46 n 6, 815 P2d 1237 (1991) (reaffirming that, "where certain limits on breadth and relevancy are satisfied, neither the Fourth Amendment nor Article I, section 9, of the Oregon Constitution [is] offended" by a statutorily authorized administrative subpoena); *Southern Oregon Broadcasting Co. v. Dept. of Revenue*, 287 Or 35, 40, 597 P2d 795 (1979) (upholding subpoena for taxpayer's records

---

[11] In *Pope & Talbot*, the court quoted the following passage to describe the limits that the state and federal constitutions place on an agency's use of an investigatory subpoena:

"'Of course a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power. But it is sufficient if the inquiry is within the authority of the agency, the demand not too indefinite and the information sought is reasonably relevant. The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable.'"

*Pope & Talbot, Inc.*, 216 Or at 616 (quoting *United States v. Morton Salt Co.*, 338 US 632, 652-53, 70 S Ct 357, 94 L Ed 401 (1950)) (citations and internal quotation marks omitted).

to determine whether income method for valuing its worth applied).

Justice Linde explained, in a related context, the premise that underlies those decisions:

> "Besides the historic objection to general warrants, the function of the guarantee [found in Article I, section 9,] is to subordinate the power of executive officers over the people and their houses, papers, and effects to legal controls beyond the executive branch itself. One measure of control is found in a carefully limited judicial warrant; another is found in legislative enactments defining and limiting official authority. Without these controls, executive officers could define and exert their own authority to search and to seize however widely they thought necessary."

*State v. Weist*, 302 Or 370, 376-77, 730 P2d 26 (1986). As *Weist* teaches and *Pope & Talbot* holds, "legislative enactments defining and limiting official authority" can authorize an administrative subpoena to obtain evidence for a civil investigation that otherwise might infringe a constitutionally protected privacy interest.[12] Indeed, if defendant were correct that customers have a protected privacy interest in their bank records that only a search warrant based on probable cause can reach, the common practice of using a legislatively authorized subpoena in civil cases to obtain a party's bank records would be called into question.[13]

---

[12] Some courts have reasoned that a subpoena *duces tecum* is less intrusive than a search warrant. As the district court explained in *Stanford Daily v. Zurcher*, 353 F Supp 124 (ND Cal 1972):

> "[a] subpoena duces tecum *** is much less intrusive than a search warrant: the police do not go rummaging through one's home, office, or desk if armed only with a subpoena. And, perhaps equally important, there is no opportunity to challenge the search warrant [before it is executed], whereas one can always move to quash the subpoena before producing the sought-after materials."

*Id*. at 130. The district court accordingly held that the state needed to use a subpoena rather than a warrant to obtain a third party's papers. *Id.* The Supreme Court reversed, reasoning that the Fourth Amendment does not prefer a subpoena over a warrant. *Zurcher v. Stanford Daily*, 436 US 547, 98 S Ct 1970, 56 L Ed 2d 525 (1978).

[13] The courts have recognized that subpoenas constitute sufficient state action to implicate any Article I, section 9, and Fourth Amendment interests that a party may have in the requested records. *See* Wayne R. LaFave, 2 *Search and Seizure* § 4.13 (5th ed 2012) (discussing government use of subpoenas in a criminal context). And, as the court explained in *Weist*, Article I, section 9, is not limited to criminal prosecutions but applies to civil actions as well. 302 Or at 376.

On review, defendant appears to recognize that the position that he took below is too broad. He now acknowledges that a warrant or an exception to the warrant requirement is not the only permissible means to obtain bank records. That is, he recognizes that a subpoena will also be "reasonable" for the purposes of Article I, section 9, if it is issued pursuant to a properly authorized administrative scheme. However, he asserts that DCBS did not issue its subpoenas pursuant to such a scheme. Additionally and perhaps alternatively, he argues that both sets of subpoenas failed to comply with the bank records statutes or that the second set of subpoenas was the fruit of the first set, which was tainted.

We begin with defendant's assertion that DCBS did not issue its subpoenas pursuant to a properly authorized statutory scheme. On that point, the legislature has prohibited the sale of unregistered securities in Oregon, ORS 59.055, and it has given DCBS authority to regulate the offering and sale of securities within this state, ORS 59.235.[14] Among other things, DCBS may investigate "whether a person has violated or is about to violate any provision of the Oregon Securities Law or any rule or order of the director" of DCBS. ORS 59.245(1). DCBS may file suit to enjoin a violation of the Oregon securities laws and may seek restitution or damages on behalf of persons injured by a violation of those laws. ORS 59.255(1), (4). Finally, ORS 59.315(1) provides that, "[f]or the purpose of an investigation *** under the Oregon Securities Law, the Director of [DCBS] may *** subpoena witnesses *** and require the production of books, papers, correspondence, memoranda, agreements or other documents or records which the director deems relevant or material to the inquiry."

The administrative subpoenas that DCBS issued in this case fell squarely within its statutory authority to investigate the sale of unregistered securities in Oregon. Defendant has not explained why DCBS's subpoenas were not issued pursuant to a properly authorized administrative

---

[14] In using the phrase "securities," we refer only to those securities that are subject to registration in Oregon. Some securities are exempt from registration in Oregon. *See* ORS 59.025 (listing exempt securities); ORS 59.049 (defining when "[f]ederal covered securities" may be offered and sold in Oregon without registration).

scheme, nor has he explained why the information that DCBS sought was not relevant to its investigation into the sale of unregistered securities. *See Pope & Talbot, Inc.*, 216 Or at 616 (stating that standard).[15] We accordingly disagree with his assertion that DCBS's subpoenas were not issued pursuant to a properly authorized statutory scheme.

Defendant advances a related but separate set of arguments. He contends that the subpoenas that were issued in this case were constitutionally "unreasonable" because "the state did not comply with the statute that sets forth the subpoena process required to access bank records." On that issue, defendant advances three arguments.

Defendant argues initially that the first set of subpoenas issued by DCBS failed to comply with the requirement in ORS 192.596(2) that the subpoenas be personally served on his wife. As noted above, however, defendant never argued in the Court of Appeals that the first set of subpoenas was deficient for that reason. Rather, he argued only that anything less than a warrant was insufficient. When a party has lost in the Court of Appeals, that party cannot ask us to reverse the Court of Appeals decision on a ground that the party did not raise in that court. *See Tarwater v. Cupp*, 304 Or 639, 644-45, 748 P2d 125 (1988) (having argued and lost in the Court of Appeals on the ground that an instruction was correct, the state could not shift position in the Supreme Court and argue that the instruction was harmless); *cf. State v. Suppah*, 358 Or 565, 572-73, 369 P3d 1108 (2016) (having won in the Court of Appeals, defendant could raise an issue on review to uphold the Court of Appeals decision that he had not raised in the intermediate court).

Defendant advances a second argument under the bank records statute. He contends that the second set of subpoenas, which the prosecutor issued pursuant to ORS

---

[15] We also note that defendant has not argued on review that DCBS issued its administrative subpoenas to obtain evidence for a criminal prosecution, nor has he explained on review why evidence uncovered in the course of a civil investigation into the sale of unregistered securities may not be used in a criminal trial for theft, aggravated theft, and criminal mistreatment. *Cf. Nelson v. Lane County*, 304 Or 97, 104 n 5, 743 P2d 692 (1987) (plurality) (Article I, section 9, does not prevent evidence of "another crime" discovered during "a legally authorized and properly administered administrative inspection" from being used in a criminal prosecution).

138.563, sought information for a longer period of time than ORS 192.603(1) authorizes.[16] That argument faces two procedural hurdles. Defendant failed to argue in either the trial court or the Court of Appeals that the subpoenas the prosecutor issued sought more information (information over a longer time period) than ORS 192.603(1) permitted. Beyond that, in the trial court, defendant expressly invited the prosecutor to use a court subpoena to obtain that information. As set out above, in the trial court, defendant invited the prosecutor to issue subpoenas pursuant to ORS 136.565 to obtain all the records that DCBS had obtained pursuant to its administrative subpoenas. We decline to reverse the Court of Appeals and the trial court on the basis of a perceived error that defendant did not raise below and in fact invited. *See State ex rel Juv. Dept. v. S.P.*, 346 Or 592, 215 P3d 847 (2009) (upholding Court of Appeals decision not to overturn trial court ruling in similar situation).

Defendant appears to raise a final issue on review regarding the second set of subpoenas. Defendant argued in the trial court that the second set of subpoenas was the fruit of the poisonous tree and appears to pursue that argument on review. As we understand defendant's argument, he contends that the state based its decision to issue a second set of subpoenas on information that DCBS learned as a result of its issuance of the first set of subpoenas. The initial difficulty with defendant's fruit-of-the-poisonous-tree argument is that the state put on evidence, which the trial court credited, that the second set of subpoenas would have been issued based on the Von Renchlers' complaints to DCBS, which were independent of any information that DCBS learned after issuing its first set of subpoenas. Beyond that, defendant did not raise this issue in the Court of Appeals and thus failed to preserve it. *See Tarwater*, 304 Or at 644-45 (party cannot seek to reverse the Court of Appeals decision on a ground not raised in that court). In these circumstances, we decline to reach defendant's fruit-of-the-poisonous-tree argument.

---

[16] ORS 192.603 provides that, when a law enforcement agency requests account information from a financial institution to assist in a criminal investigation, the institution shall supply information limited to three months before and three months after the "date of occurrence of the account transaction giving rise to the criminal investigation." ORS 192.603(1).

Given the factual and legal posture in which this issue arises, we resolve this case on the following ground: Even if defendant has a protected privacy interest in his wife's bank records, our decisions lead to the conclusion that the administrative subpoenas issued by DCBS did not violate defendant's Article I, section 9, rights. We leave for another day the question whether and in what circumstances a defendant will have a protected privacy interest in information that a third party maintains, a question that can arise in differing factual circumstances which can have a bearing on its resolution. On that basis, we affirm the Court of Appeals decision and the trial court's judgment.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.