No. 14 March 9, 2017 187

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review,*

*v.*

BELL MURPHY ANDERSEN,
*Respondent on Review.*

(CC C111600CR; CA A150872; SC S063169)

On review from the Court of Appeals.*

Argued and submitted January 12, 2016.

Susan G. Howe, Assistant Attorney General, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General.

Ingrid MacFarlane, Chief Deputy Defender, Salem, argued the cause and filed the brief for respondent on review. Also on the brief was Ernest G. Lannet, Chief Defender, Office of Public Defense Services.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Baldwin, and Brewer, Justices.**

KISTLER, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

Walters, J., concurred and filed an opinion.

_____

\* On appeal from the Washington County Circuit Court, Steven L. Price, Judge. 269 Or App 705, 346 P3d 1224 (2015).

\*\* Nakamoto, J., did not participate in the consideration or decision of this case.

**KISTLER, J.**

Under the automobile exception to Article I, section 9, officers may search a car if they have probable cause to believe that the car contains evidence of a crime and the car is mobile at the time they stop it. *State v. Brown*, 301 Or 268, 274, 721 P2d 1357 (1986). The automobile exception does not apply, however, if the car is "parked, immobile and unoccupied at the time the police first encounte[r] it in connection with the investigation of a crime." *State v. Kock*, 302 Or 29, 33, 725 P2d 1285 (1986). In this case, two officers were waiting for defendant's car to arrive at a WinCo parking lot to complete a drug sale. One officer was out of sight of the parking lot but listened as defendant's passenger explained over his cell phone that he and defendant were arriving at the parking lot. The second officer left one part of the parking lot to see if defendant had arrived at a different part of the lot. When he did not see defendant's car, he returned to where he had been a minute earlier and saw defendant's car parked across several parking spaces. Defendant was sitting in the driver's seat with the engine running as two passengers stepped out of the car and were walking towards the area where the drug sale was supposed to occur.

The trial court held that, although defendant's car momentarily had come to rest before the second officer saw and stopped it, the car was mobile for the purposes of the automobile exception. The court accordingly denied defendant's motion to suppress the evidence that the officers found when they later searched the car and its contents. The Court of Appeals reversed. *State v. Andersen*, 269 Or App 705, 346 P3d 1224 (2015) (en banc). In its view, the automobile exception applied only if defendant's car was moving when the officer first saw it. Because defendant's car momentarily had come to rest before the officer saw it, the Court of Appeals held that the automobile exception did not apply. We allowed the state's petition for review and now reverse the Court of Appeals decision and affirm the trial court's judgment.

In 2011, Officer McNair of the Beaverton City Police Department arranged a methamphetamine purchase through a confidential reliable informant. Specifically, on

July 25, 2011, around 4:00 p.m., the informant contacted Compton, a known "player" around Beaverton, to ask about buying a half ounce of methamphetamine. Initially, Compton said that he did not know anyone who had that much methamphetamine on them. However, around 8:00 p.m., the informant spoke with Compton again, who said that he had found a seller. Compton identified the seller as "his girl" and said that she would be driving a silver Jeep. The informant and Compton agreed that the sale would take place near the WinCo store on Cedar Hills Boulevard in Beaverton.

After the informant and Compton arranged the sale, they exchanged a series of text messages and phone calls. The informant asked when Compton and the seller were coming, which was followed by a series of messages from Compton saying that they were leaving soon and that he would call "when we're on our way." "[E]ventually, [Compton] called [the informant sometime before 11:00 p.m] and said that they were on their way, and at that time they said something about a red four-door car."[1] As the informant and Compton exchanged calls and text messages, the location for the sale changed several times. The parties ultimately settled on a Plaid Pantry across the street (Cedar Hills Boulevard) from the WinCo parking lot. Compton was going to park in the WinCo parking lot and walk across the street to the Plaid Pantry. The informant was going to be coming from a house behind the Plaid Pantry, where he and Compton would complete the sale.

As Compton and defendant were approaching the WinCo parking lot, Compton was on his cell phone talking with the informant while Officer McNair was listening to their conversation. "[J]ust when [Compton and defendant] were arriving" at the parking lot, Compton told the informant (and McNair) over the phone, "We're pulling in." Compton then said over the cell phone, "I'm—I'm here. I'm arriving." Compton asked the informant, "Where are you at?" The informant replied, "I'll be walking up" to the Plaid Pantry from the nearby house to complete the sale. Because McNair and the informant were parked out of sight of the

---

[1] It turned out that Compton was a passenger in the car defendant was driving.

WinCo lot, McNair did not see defendant's car arrive at the WinCo parking lot. However, he heard Compton's running account of the car's arrival.

McNair had arranged for other officers to be around the WinCo parking lot and told them "that they should be either looking for the silver Jeep that had been described earlier, or some red four-door" car. McNair also told the officers to be looking for Compton, whom they knew. One of the officers, Officer Henderson, was parked at the east end of the WinCo parking lot, next to Cedar Hills Boulevard, waiting for defendant's arrival. As defendant's car was approaching the parking lot, Henderson left the east end of the parking lot and drove to the side of the WinCo store to look for a silver Jeep or a red four-door car.[2] Henderson did not see either car parked there, and he returned to the east end of the parking lot approximately a minute later. When he did, he saw a silver Jeep "parked within a few hundred—or maybe 100 feet of Cedar Hills Boulevard." The Jeep had not been there when Henderson left a minute earlier. The Jeep was not parked in a parking spot but was instead "parked crossing over the lines." Defendant was sitting in the driver's seat with the engine running.

When Henderson saw the Jeep, he noticed that there were several people inside. He also saw a person whom he recognized as Compton walking away from the Jeep in the direction of the Plaid Pantry. Compton was talking with another man. As Henderson watched, both men turned around and walked back to the Jeep. The other man got in the front passenger seat of the Jeep. Compton spoke to the man through the car window and then "leaned in the vehicle, putting most of his torso in the vehicle. It appeared to [Henderson] as though [Compton] was reaching across [the other man]." Based on what he saw and what he had learned from McNair about the proposed drug sale, Henderson concluded that he had probable cause to believe that there were drugs inside the Jeep and that he also had probable cause "to believe that Mr. Compton had come to the location with the intent to distribute."

---

[2] The WinCo store was located at the west end of the parking lot. The east end of the parking lot borders Cedar Hills Boulevard.

At that point, Henderson and other officers approached the Jeep. When they did so, the "vehicle was running, with the keys in the ignition with [defendant] * * * behind the wheel." The Jeep, however, "was not actually in physical motion." The officers stopped the Jeep until a drug detection dog arrived, which initially alerted on the outside of the Jeep and later on defendant's purse, which the officers found inside the Jeep. Inside defendant's purse, the officers found approximately 14 grams of methamphetamine.

The state charged defendant with possession and delivery of 10 or more grams of methamphetamine. Before trial, defendant moved to suppress the evidence that the officers had found in her vehicle. Among other things, defendant argued that the automobile exception to Article I, section 9, did not apply because the car was not mobile when the officers first encountered it. The trial court was not persuaded. It found "that this was a mobile vehicle, as that term is meant in the vehicle exception. So that does justify searching the vehicle, if there's probable cause." The trial court determined that Henderson had probable cause to believe that the Jeep contained evidence of a crime, and it held that the search of the Jeep and its contents came within the automobile exception to Article I, section 9. Based in part on the evidence discovered in the Jeep, a jury found defendant guilty of unlawful possession and unlawful delivery of 10 grams or more of methamphetamine.

On appeal, defendant argued that the trial court erred in ruling that the automobile exception to Article I, section 9, applied.[3] On that issue, defendant did not dispute that the officers had probable cause to believe that the Jeep contained methamphetamine. She argued, however, that "the automobile exception requires an actual *stop* of a *moving* vehicle." (Emphases in original.) She reasoned that, because the officers "never saw [her] car moving" and because the officers did not contact her "until her car was parked," the automobile exception did not apply. The Court of Appeals agreed. After reviewing our automobile exception cases, the Court of Appeals concluded that Oregon's

_____

[3] Defendant has not argued on appeal or review that the officer's search of the Jeep and her purse violated the Fourth Amendment.

automobile exception "requires officers to see [a] car being driven when they first encounter it." *Andersen*, 269 Or App at 715. Because defendant's Jeep had arrived at the WinCo parking lot and had momentarily come to rest before the officers first saw it, the court concluded that the Jeep was not "moving" but was merely "movable." *Id.* It followed, the Court of Appeals reasoned, that Oregon's automobile exception did not apply, and the officers' warrantless search of the Jeep violated Article I, section 9. *Id.*

Judge DeVore dissented. In his view, the majority was "overcorrect[ing]" in response to *State v. Kurokawa-Lasciak*, 351 Or 179, 263 P3d 336 (2011), which reversed a Court of Appeals decision holding that the automobile exception applied whenever a car is "operable." *Anderson*, 269 Or App at 727 (DeVore, J., dissenting). Judge DeVore reasoned that the mere fact that a parked car is "operable" does not mean that it is mobile for the purposes of the automobile exception. Conversely, he reasoned, seeing a car in motion is not the *sine qua non* of mobility. *Id.* at 729. Rather, the dissent would have held that it is sufficient if the officers reasonably could infer based on their perceptions that the Jeep had come to a momentary stop and would have resumed moving had they not stopped it. *Id.* at 733. The dissent concluded:

> "To be precise, if a vehicle is still operating, with a driver at the steering wheel and the engine running, and police have objective evidence that the vehicle has moved recently or will move imminently, then that vehicle 'remains mobile' [for the purposes of Oregon's automobile exception]."

*Id.* at 733-34. We allowed the state's petition for review to consider that issue.[4]

---

[4] The state did not argue in the Court of Appeals that the search in this case was permissible under the search-incident-to-arrest exception to Article I, section 9. *See State v. Caraher*, 293 Or 741, 759, 653 P2d 942 (1982) (holding that a search incident to arrest under Article I, section 9, is not limited to "considerations of the officer's safety and [the] destruction of evidence" but also "permit[s] a search when it is relevant to the crime for which [the] defendant is being arrested and so long as it is reasonable in light of all the facts"). Because the state lost in the Court of Appeals, that issue is not before us, and we express no opinion on it. *See State v. Ghim*, 360 Or 425, 442, 381 P3d 789 (2016) (a party challenging a Court of Appeals decision is ordinarily limited to the grounds that the party raised in the Court of Appeals).

Thirty years ago, this court recognized an automobile exception to the warrant requirement of Article I, section 9, "provided (1) that the automobile is mobile at the time it is stopped by police or other governmental authority, and (2) that probable cause exists for the search of the vehicle." *Brown*, 301 Or at 274. As this court explained in *Brown*, the exigency that permits officers to conduct a warrantless search of a mobile vehicle arises from the fact that "'the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.'" *Id.* at 275 (quoting *Carroll v. United States*, 267 US 132, 153, 45 S Ct 280, 69 L Ed 2d 543 (1925)). The court was careful to make clear, however, that the mere fact that a vehicle is operable does not mean that it is mobile for the purposes of the Oregon automobile exception. *See id.* at 277 (distinguishing the search of a parked car). Similarly, the court observed in a companion case that, in recognizing an Oregon automobile exception, "we do not reach the issue of warrantless searches of unoccupied, parked or immobile vehicles." *State v. Bennett*, 301 Or 299, 304, 721 P2d 1375 (1986).

Three months after this court decided *Brown* and *Bennett*, it addressed the issue that it had noted but not decided in those cases—whether the Oregon automobile exception applies when officers engage in a warrantless search of a parked car. *Kock*, 302 Or at 31-32. In *Kock*, the defendant had parked his car at his workplace. Midway through his shift, he took merchandise from the store where he worked, put it in his parked car, and then returned to work. *Id.* Given those facts, this court held that Oregon's automobile exception did not apply. It explained "that any search of an automobile that was parked, immobile and unoccupied at the time the police first encountered it in connection with the investigation of a crime must [either] be authorized by a warrant" or come within some other exception to the warrant requirement. *Id.* at 33. In placing that limitation on the Oregon automobile exception, this court noted that it sought to give officers "clear guidelines" for their actions and that it "ch[o]se not to stretch the automobile exception [under Article I, section 9,] as far as the Supreme Court of the United States has done in interpreting the Fourth Amendment." *Id.*

*Brown* and *Kock* arose out of factual situations that fell at either end of a spectrum. In *Brown*, officers stopped a car as it drove on a highway based on reasonable suspicion that the driver had committed a crime. By contrast, in *Kock*, the defendant had parked his car at work during his shift. The car was operable but it was not in transit; the defendant's car was, in the court's words, "parked, immobile and unoccupied at the time that the police first encountered it in connection with the investigation of a crime." *Id.*

Although *Brown* and *Kock* sought to provide guidance to officers and citizens, neither case had occasion to consider factual situations that fall somewhere between the facts in those two cases. More recently, this court has considered two such cases. *See Kurokawa-Lasciak*, 351 Or at 181-85; *State v. Meharry*, 342 Or 173, 149 P3d 1155 (2006). In *Meharry*, a local fire chief saw the defendant driving erratically and reported his observations to a local police officer, who came out of the police station. When he did, he saw the defendant drive past him and park her van at a convenience store before he could stop her on suspicion of driving under the influence of intoxicants. The officer pulled his car behind the defendant's parked van, stopping it from leaving, and searched her van for evidence of intoxicants after developing probable cause that the defendant had been driving under the influence.

In holding that the officer's search came within the automobile exception recognized in *Brown*, this court observed initially that the officer "first encountered [the] defendant's van in connection with a crime when he saw her drive by the police station. At that point, the van was mobile." *See id.* at 179. Additionally, the court rejected the argument that the defendant's car was not mobile when the officer stopped it because the defendant had already parked the car and gone into the convenience store. As the court framed the question, the issue was whether stopping "an otherwise mobile car from resuming its journey," as the officer had done in *Meharry*, differed for the purposes of the Oregon automobile exception from causing a moving car to come to a stop, as the officer had done in *Brown*. *Id.* at 180. As the court explained, the fact that the officer "did not have

time to effectuate a stop before [the] defendant pulled into the [convenience store] parking lot but instead effectuated a stop by preventing [the] defendant from continuing her journey d[id] not make her van any less mobile, nor d[id] it make it any less likely that her van—and any evidence inside the van—could have been moved once [the officer] relinquished control over it." *Id.* at 180-81. The court accordingly held that the automobile exception applied to a vehicle that momentarily had come to rest.

In *Kurokawa-Lasciak*, the facts fell on the other side of the line that the court had drawn in *Brown* and *Kock*. In *Kurokawa-Lasciak*, the defendant was gambling at the Seven Feathers Casino when casino employees began to suspect that he was laundering money. 351 Or at 181. The casino prohibited the defendant from engaging in further cash transactions for 24 hours and posted his photograph in its cashiers' cages. *Id.* Early in the morning, the defendant attempted to engage in a cash transaction and, in the course of that attempt, reached into the cashier's cage and grabbed his photograph. Approximately 10 minutes later, he left the casino, got into his van, and drove to a gas station. Fifteen minutes after that, he returned to the casino, parked his van, got out, and began walking back towards the casino. *Id.* at 182. After he had gotten approximately 30 feet from his van, an officer saw defendant walking towards the casino and stopped him on suspicion of money laundering. *Id.* Neither that officer nor another officer who arrived later saw the defendant drive his van. *Id.* However, the officers relied on the automobile exception to search the defendant's parked van, where they found evidence of illegal drug use and approximately $48,000 in cash. *Id.* at 184-85.

In *Kurokawa-Lasciak*, this court adhered to the line that it had drawn in *Brown* and *Kock*. It explained that, contrary to the Court of Appeals decision, this court had not held in *Meharry* that Oregon's automobile exception applies whenever a car is "operable." *Id.* at 192-93. Rather, the court reiterated that "the vehicle that the police search must be mobile at the time that the police encounter it in connection with a crime." *Id.* at 192. Applying that standard, the court

noted that the trial court had found that, "when [the officer] stopped [the] defendant, [the] defendant was approximately 30 feet from his van, which was parked, immobile, and unoccupied, and that, when [the other officer] questioned [the] defendant, [the] defendant was no longer near the van." *Id.* at 194. In reaching that conclusion, the court accepted the state's admission that "there was no evidence from which the trial court could have found that [the] defendant's van was mobile when [either officer] encountered it in connection with a crime." *Id.*

In both *Meharry* and *Kurokawa-Lasciak*, this court adhered to the line that it drew in *Brown* and *Kock*. We do so here as well. That is, we reaffirm that the Oregon automobile exception applies if the automobile is mobile when the officers first encounter it in connection with the investigation of a crime. We also reaffirm that the exception does not apply if the car is parked, unoccupied, and immobile when officers encounter it. After explaining why those decisions lead us to affirm the trial court's judgment in this case, we explain why we decline defendant's invitation to overrule our decisions.

In this case, defendant's Jeep momentarily had come to rest in the WinCo parking lot when the officers stopped it from resuming its journey. The Court of Appeals reasoned that, because the officers had not seen the Jeep in motion before they stopped it, the Jeep was not mobile when the officers first encountered it. The Court of Appeals' reasoning is difficult to square with our decision in *Meharry*. More specifically, the Court of Appeals took an unnecessarily restrictive view of the kind of evidence that will establish that a car is mobile when officers first encounter it.

As discussed above, Compton had told the informant (and Officer McNair) that defendant was driving either a Jeep or a red sedan to the WinCo parking lot to complete a drug transaction. More importantly, McNair overheard Compton give the informant a running account of the car's progress as it approached and entered the WinCo parking lot. Compton told the informant and McNair over his cell phone, "I'm here. I'm arriving," and "We're pulling in[to]" the lot.

It is true, as the Court of Appeals noted, that McNair did not see defendant's Jeep pull into the WinCo parking lot. And it may be that, in many cases, officers will determine that a car is mobile when they first encounter it by seeing the car in motion. However, Compton's running account of the car's progress and arrival at the WinCo parking lot provided McNair with as clear a confirmation of the Jeep's mobility as did the officer's sighting of the defendant driving her van erratically past the police station in *Meharry* or the officer's view of the car's movement in *Brown*. Put differently, the fact that McNair learned aurally what the officer in *Meharry* learned visually—that the car that was the subject of each officer's investigation was mobile when the officer first encountered it—provides no principled basis for distinguishing this case from either *Meharry* or *Brown*

One other issue deserves brief mention. Defendant's Jeep had come to rest before the officers stopped it. The trial court, however, reasonably could have found that defendant had stopped her car only momentarily—just long enough to complete the drug transaction—before resuming her trip. Defendant's momentary pause in her trip is no different from the defendant's momentary stop at the convenience store in *Meharry* before resuming her journey. Indeed, in *Meharry*, the defendant had turned off the engine, stepped out of her van, and stepped into the convenience store. In this case, defendant remained in the driver's seat of her Jeep with the engine running while Compton stepped out of the Jeep to complete the drug transaction. If the defendant's van in *Meharry* remained mobile for the purposes of Oregon's automobile exception, then it is difficult to see why defendant's Jeep was not also mobile. When the officers stopped her Jeep, it was not "parked, immobile, and unoccupied" as the defendants' cars were in *Kock* and *Kurokawa-Lasciak*.

Because we perceive no meaningful distinction between this case and *Meharry*, we uphold the trial court's ruling that defendant's Jeep was mobile when the officers first encountered it in connection with their investigation of the drug sale. Because defendant does not dispute that the officers also had probable cause to believe that her Jeep

contained methamphetamine, it follows that the trial court correctly held that the officers' warrantless search of the Jeep and its contents came within the automobile exception to Article I, section 9. *See Brown*, 301 Or at 274.

We address one final issue. Defendant argues that, if we conclude that the search in this case comes within the automobile exception, as our cases have described it, then we should overrule those cases. We have considered the various grounds that defendant has asserted for overruling our automobile exception cases, and we write to address one of them. This court explained in *Brown* that the "[m]obility of the vehicle at the time of the stop, by itself, creates the exigency." *Id.* at 276. The court also recognized, however, that changes in technology could eliminate the exigency that underlies the automobile exception. *Id.* at 278 n 6. *Brown* accordingly held out the possibility that technological and other changes might permit warrants to be obtained "within minutes," with the result that the automobile exception might no longer be justified. *Id.* Defendant argues that we should overrule *Brown* because warrants can now be obtained within minutes.

We question the premises on which defendant's argument rests. As an initial matter, the length of time that it takes to write a warrant application and obtain a warrant is a factual issue for the trial court, and not all warrants will take the same amount of time. Depending on the complexity of the circumstances that give rise to probable cause and the significance of the case, some warrants will require a longer time to prepare and obtain than others. In this case, the only evidence in the record is that it would have taken hours, not minutes, to prepare a warrant application and obtain a warrant. Officer McNair testified without contradiction that, "[j]ust [to get a warrant] for a cell phone it takes me several hours to write a search warrant, and go get that approved by a DA." The officer also explained that, if the district attorney had suggestions or corrections, it could take another hour to add those corrections to the warrant application. Not only did the trial court implicitly credit the officer's testimony, but defendant identifies no contrary evidence in the record.

Beyond that, defendant's argument appears to assume that the only impediment to obtaining a warrant quickly is the time that it takes to transmit a completed warrant application to a magistrate and have the magistrate review and act on the application. While technology has made it easier to prepare and transmit completed applications, the testimony in this case illustrates what our cases have recognized. An officer must prepare the warrant application before submitting it to a magistrate for approval, and the process of preparing a warrant application can sometimes entail a substantial amount of time. Affidavits submitted in support of a warrant are subject to technical requirements that are intended to protect citizens' privacy. When the affiant lacks personal knowledge of the facts that give rise to probable cause and relies instead on information from other persons, the affidavit must demonstrate the reasons why the affiant finds the informant credible or reliable, and the affidavit must be written with sufficient specificity to ensure that the resulting warrant does not authorize searches and seizures of people or places for which probable cause has not been established.[5]

Ultimately, not only must search warrant applications be sufficient to satisfy issuing magistrates, but they also must withstand scrutiny in later motions to suppress if evidence discovered while executing the warrant leads to a criminal prosecution. As in this case, district attorneys may review warrant applications drafted by officers who may be experienced in criminal matters but untrained in the law. Without that review, warrant applications might fail to comply with the technical specifications our cases have required. Those human efforts can sometimes entail substantial expenditures of time despite technological advances.

---

[5] For example, if probable cause is based on statements from one or more informants, the application must establish the basis of each informant's knowledge and the credibility or reliability of that informant. *See State v. Alvarez*, 308 Or 143, 149, 776 P2d 1283 (1989) (describing relationship between two unnamed informants and why the affidavit provided sufficient facts to establish that each informant was credible or reliable). Moreover, the places and people to be searched must be identified with sufficient particularity. *See State v. Reid*, 319 Or 65, 71, 872 P2d 416 (1994) (authorization to search "persons present" at residence too broad because that authorization could include persons who had no connection to illegal activity); *State v. Ingram*, 313 Or 139, 143, 145, 831 P2d 674 (1992) (warrant authorizing officers to search "all vehicles determined to be associated with the occupants of said premises" overbroad).

We do not foreclose the possibility that *Brown* held out—that changes in technology and communication could result in warrants being drafted, submitted to a magistrate, and reviewed with sufficient speed that the automobile exception may no longer be justified in all cases. Nor do we foreclose a showing in an individual case that a warrant could have been drafted and obtained with sufficient speed to obviate the exigency that underlies the automobile exception. *See State v. Machuca*, 347 Or 644, 657, 227 P3d 729 (2010) (explaining that, under Article I, section 9, the exigency arising from the dissipation of alcohol ordinarily will permit a warrantless blood draw while recognizing that the particular facts in an individual case may show otherwise); *cf. Missouri v. McNeely*, 569 US ___, 133 S Ct 1552, 185 L Ed 2d 696 (2013) (rejecting the state's argument that the exigency resulting from the dissipation of alcohol will be present in every case).

Ordinarily, the speed with which a warrant reasonably could be obtained is, in the first instance, a factual question for the trial court. *Cf. State v. Wagner*, 305 Or 115, 153-54, 752 P2d 1136 (1988) (declining to rely for the first time on appeal on reports and facts found in other cases), *vac'd on other grounds sub nom Wagner v. Oregon*, 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989). As noted above, the only evidence in this record, which the trial court implicitly credited, was that it would have taken hours, not minutes, to obtain a warrant. Given that record and the trial court's resolution of defendant's motion, we decline to overrule the automobile exception in all cases, as defendant urges, or to conclude that it is inapplicable in this case. Rather, we affirm the trial court's conclusion that the automobile exception applied here.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

**WALTERS, J.,** concurring.

I write to emphasize an important point that the majority makes and with which I agree: The Oregon automobile exception permits a showing, in an individual case, "that a warrant could have been drafted and obtained with sufficient speed to obviate the exigency." *State v. Andersen*,

361 Or 187, 201, ___ P3d ___. Thus, although the majority does not overrule *State v. Brown*, 301 Or 268, 721 P2d 1357 (1986), the majority recognizes that the exception created in that case is and must be aligned with other Oregon exigency exceptions to the warrant requirement.

This court has long held that Article I, section 9, does not require a warrant when exigent circumstances exist; that exigent circumstances exist when the facts demonstrate that the police must "act swiftly to prevent danger to life or serious damage to property, or to forestall a suspect's escape or the destruction of evidence"; and that whether exigent circumstances exist must be determined based on the particular facts presented, and not on a categorical basis or pursuant to a *per se* rule. *State v. Snow*, 337 Or 219, 223-25, 94 P3d 872 (2004) (internal quotation marks omitted) (stating rule and finding that facts demonstrated exigent circumstances); *State v. Stevens*, 311 Or 119, 126-30, 806 P2d 92 (1991) (same); *State v. Bridewell*, 306 Or 231, 235-36, 759 P2d 1054 (1988) (facts did not demonstrate exigent circumstances); *State v. Jimenez*, 357 Or 417, 426, 353 P3d 1227 (2015) (refusing to adopt *per se* rule recognizing exigent circumstances in all instances); *State v. Cocke*, 334 Or 1, 9, 45 P3d 109 (2002) (declining to recognize *per se* exception to warrant requirement for "protective sweep," but permitting use where particular circumstances justify it); *State v. Guggenmos*, 350 Or 243, 258-59, 253 P3d 1042 (2011) (reviewing totality of the circumstances to determine whether officers' "sweep" justified by officer safety concerns); *State v. Machuca*, 347 Or 644, 656-57, 227 P3d 729 (2010) (refusing to recognize *per se* exigency rule and prohibiting warrantless searches and seizures to obtain blood alcohol evidence if facts of particular case establish that "'a warrant [could have been] obtained without sacrificing the evidence'" (quoting *State v. Milligan*, 304 Or 659, 665-66, 748 P2d 130 (1988))); *see also State v. Moore*, 354 Or 493, 497 n 5, 318 P3d 1133 (2013), *opinion adh'd to as modified on recons*, 354 Or 835, 322 P3d 486 (2014) (noting that *Machuca* is consistent with federal constitutional law, which rejects a *per se* exigency rule for alcohol dissipation (citing *Missouri v. McNeely*, 569 US __, 133 S Ct 1552, 185 L Ed 2d 696 (2013))).

In permitting that same case-by-case analysis when the state relies on the automobile exception to justify a warrantless search, the majority assures that, unless exigent circumstances are actually present, a neutral magistrate, and not the individual who performs the search, will determine whether there is probable cause to search. That mode of analysis is essential to protect Oregonians' right to privacy. Any other rule would "improperly ignore the current and future technological developments in warrant procedures," and "diminish the incentive for jurisdictions 'to pursue progressive approaches to warrant acquisition that preserve the protections afforded by the warrant while meeting the legitimate interests of law enforcement.'" *McNeely*, 133 S Ct at 1563 (quoting *State v. Rodriguez*, 570 Utah Adv Rep 55, 156 P3d 771, 779 (2007)).

When this court created the Oregon automobile exception in 1986, it expected that technological advances would occur and that this state would pursue progressive approaches to warrant acquisition. *State v. Brown*, 301 Or at 278 n 6. Those advances have occurred, and state law permits police departments to make use of them. ORS 133.545(8) authorizes the electronic transmission of proposed warrants and affidavits to a judge, as well as the electronic transmission of the signed warrant back to the person who made the application. In Multnomah County, warrant affidavits can be submitted "in person, by telephone or by email," City of Portland Police Bureau Directives Manual, ch 652.00, and, in *State v. Machuca*, 231 Or App 232, 245, 218 P3d 145 (2009), an officer "conceded that he could have obtained a telephonic search warrant in one hour."

Evidence from other jurisdictions suggests that police officers should be able to obtain warrants in less than one hour. In 1973, before the introduction of the first commercially available cell phone,[1] the San Diego District Attorney's Office estimated that 95 percent of warrants were obtained in less than forty-five minutes. Comment, *Oral Search Warrants: A New Standard of Warrant Availability*, 21 UCLA

---

[1] *See* Zachary M. Seward, *The First Mobile Phone Call Was Made 40 Years Ago Today*, The Atlantic, (Apr 3, 2013), *available at* http://www.theatlantic.com/technology/archive/2013/04/the-first-mobile-phone-call-was-made-40-years-ago-today/274611/ (accessed Mar 7, 2017).

L Rev 691, 694 n 23 (1973); *see also People v. Blackwell*, 195 Cal Rptr 298, 302 n 2 (Cal Ct App 1983) (citing same estimate). In *United States v. Baker*, 520 F Supp 1080, 1084 (SD Iowa 1981), the district court concluded that the entire process of obtaining a warrant by telephone would have taken 20 to 30 minutes. And, in 2015, the New Jersey Supreme Court cited to a pilot program that examined 42 telephonic automobile search warrant applications and found that "[t]he average request for an automobile warrant took approximately 59 minutes, from the inception of the call to its completion." *State v. Witt*, 223 NJ 409, 436, 126 A3d 850, 865-66 (2015).

However, the fact that that technology exists is just one factor in the exigency analysis that this case permits. If an officer testifies that, in the particular circumstances presented, the time it reasonably would have taken to get a warrant would have resulted in the destruction of evidence, then that testimony may demonstrate that a warrantless search was justified. *See, e.g.*, *Snow*, 337 Or at 223 (holding exigency exists when situation requires police to act swiftly to prevent destruction of evidence). In this case, the officer who conducted the search testified at trial that it would have taken him three hours to write a warrant application and two hours to get authorization from an on-call district attorney to seek judicial approval, after which he would have had to go to a judge's residence to get the warrant signed. Those are facts from which the trial court could have found an exigency and that could have served as the basis for denial of defendant's motion to suppress.[2] Although the trial court did not expressly cite that evidence as a basis for its ruling, the delay to which the officer testified could support it. I therefore concur with the result that the majority reaches and would affirm the trial court's judgment.

---

[2] I do not mean to imply that that is the only conclusion that a trial court could have reached. The delay that gives rise to an exigency must be reasonable. *See Stevens*, 311 Or at 130 (noting that case was not one in which delay was unreasonable). Washington County may not provide for telephonic or other electronic search warrants, *see State v. Sullivan*, 265 Or App 62, 65, 333 P3d 1201 (2014) (officer testified that telephone warrants not available in Washington County), and, in a future case, a trial court could find that an officer's failure to use statutorily-authorized and widely-available technology was unreasonable and precluded a finding of exigent circumstances.